**IN THE SUPREME COURT OF THE STATE OF IDAHO**

**Docket No. 52131**

| | | |
|---|---|---|
| **JAMES WILSON,** | ) | |
| | ) | |
| **Petitioner-Counterdefendant-Appellant,** | ) | |
| | ) | **Boise, November 2024 Term** |
| **v.** | ) | |
| | ) | **Opinion Filed: December 18, 2024** |
| **JILLIAN WILSON,** | ) | |
| | ) | **Melanie Gagnepain, Clerk** |
| **Respondent-Counterclaimant-Respondent on Appeal.** | ) | |
| _____ | ) | |

Appeal from the Magistrate Court of the Fourth Judicial District of the State of Idaho, Ada County, Matthew Haynes, Magistrate Judge.

The decision of the magistrate court is <u>affirmed</u>.

Gravis Law, PLLC, Boise, and Defriez Law, Caldwell, for Appellant. Brian M. DeFriez argued.

Chaney Law Office, PLLC, Caldwell, for Respondent. Greg Chaney argued.

_____

BRODY, Justice

This is an expedited, permissive appeal of a child custody order permitting relocation of a minor child. Appellant James Wilson and Respondent Jillian Wilson were married with one minor child. Following a divorce proceeding, the magistrate court awarded primary physical custody to Jillian and permitted her to relocate with the minor child to Australia, where she and the child hold citizenship. The magistrate also awarded Jillian sole legal custody in educational and medical decisions. James was granted a two-week period of visitation each year during school breaks. James appeals to this Court. We affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Courtship, marriage, and birth of minor child

James Wilson and Jillian Wilson met in October 2014, in Canberra, Australia. James was visiting Australia to teach a seminar for Pray North State, a religious non-profit organization of

1

which James is president. Jillian, a citizen of Australia, attended the seminar with her mother, where James approached Jillian and shared an encouraging word with her. At the time, Jillian was 26 years old; James was 66 years old and married to Dianna Wilson, with whom he lived in California. James, an American citizen, returned to California after the seminar, and Jillian contacted him via email to further inquire about some of his teaching from the seminar. The parties subsequently began communicating via Skype, and Jillian became James's "spiritual daughter." A "spiritual daughter" is a person James would mentor during difficult periods, or periods of "emotional deficit," in the person's life.

In the spring of 2015, Jillian visited James and his wife in California. During Jillian's stay, James laid down with Jillian in her bed, cuddled her, and intimately caressed her. After Jillian returned to Australia, the two continued to communicate, and they both shared that they had a romantic interest in the other. James, still married to Dianna, traveled back to Australia in October 2015, where he performed a religious marriage ceremony with Jillian. James had told Jillian that he had divorced Dianna in his heart and was "biblically" and "spiritually" divorced from her. James and Jillian then began a sexual relationship. Dianna filed for divorce from James in November 2015; by August 2016, James and Dianna were officially divorced. He then traveled to Australia on a twelve-month visa in August 2016, and he and Jillian lived together in an apartment in Canberra. The couple were legally wed in Australia on September 26, 2016.

On March 5, 2017, the parties' only child, Z.W., was born in Australia. Z.W. is a citizen of both Australia and the United States. Both parties cared for Z.W. after her birth until Jillian, a schoolteacher, returned to work three days a week. James cared for Z.W. while Jillian was at work, as did Jillian's extended family. In November 2017, James returned to the United States because his visa was expiring, and he did not want to pay for an extended visa to stay in Australia. After returning to the United States, James resided in Idaho. Jillian and Z.W. joined James in Idaho in December 2017.

B.      **Marriage difficulties, civil protection order, and divorce filing**

By June 2022, relations between James and Jillian had deteriorated. One day, as Jillian was attempting to leave the house to go to the gym, James grabbed her arm, pulled her to him, placed his arms on top of her shoulders, and refused to let go until she had given him a hug and a kiss. Approximately five days later, while Jillian was under the belief that James was taking her to lunch

to discuss the couple's finances, James drove with Jillian approximately forty-five minutes in the opposite direction of the restaurant, to Jillian's place of employment against her protestations.

On July 30, 2022, Jillian told James that she was taking Z.W. to a movie but did not return. Shortly thereafter, James was served with an *ex parte* protection order. Following a hearing, the magistrate court dismissed the protection order and concluded that there was no threat of imminent danger from domestic violence, as defined under Idaho Code sections 39-6303(1) and 39-6306(1). However, the magistrate court also stated that Jillian had proven, "beyond a reasonable doubt," that she had "been the victim of domestic violence under th[e greater advocacy community's] definition by Mr. Wilson in that he has, I think from the time he met [Jillian], taken extraordinary steps to control [her] life." The magistrate court's statement was based not only on the June 2022 incidents, but also upon Jillian's testimony that James had denied her the ability to control her finances, had interfered with the privacy settings of her own personal computer, and had hidden her passport.

Following the dismissal of the protection order, Jillian and Z.W. obtained their own apartment, and James remained in the marital home. James filed for divorce in August 2022. On February 27, 2023, the magistrate court ordered a Parenting Time Evaluation (PTE) to be conducted pursuant to Rule 1004 of the Idaho Rules of Family Law Procedure. Jillian subsequently filed an amended verified answer and counterclaim to James's petition for divorce, requesting that she be granted primary physical custody of the child and permission to relocate with the child to Australia.

## C.      Parenting time evaluation

The PTE was completed and lodged with the magistrate court on February 11, 2024. The evaluation revealed that a CARES forensic interview had been conducted with the child in May 2023, after the child had disclosed to Jillian that James washes her "on the chest and between her legs." Portions of the forensic interview were incorporated into the PTE, including the child's disclosures during that interview. The child, who was six years-old at the time, had disclosed that James "washes me" in the "private parts where he's not supposed to" and "I don't like it." She disclosed that he "washes where [her] 'bottom' is that 'pees' [and] 'he gets soap . . . going [into] my 'holes' " which feels "sour" and "stings." The evaluation also noted that the magistrate court ordered a child protection investigation to be conducted by the Idaho Department of Health and

Welfare (IDHW). IDHW filed its report in June 2023, concluding the referral was closed as "unsubstantiated due to insufficient evidence."

As part of the PTE process, the evaluator interviewed the child. The child stated that Jillian is "kind and loving," and "never rude" to her. She reported that her father yells at her, but her mother never engages in that type of behavior but instead "talk[s] to her, ask[s] her to apologize, or send[s] her to timeout." The child disclosed an incident in which James had twisted her arms, held her down on a bed, and "locked" her in the room. This incident arose after James had accused Z.W. of "throwing" a fork during a meal. The child was adamant that the fork had " 'accidentally' slipped out of her hand." When she tried to take a bite of her food, James blocked her arm so she could not, then forced her to go to timeout. When asked by the evaluator about what happened next, she disclosed the following:

> And the[n] I tried to escape and then he [James] put me on my bed and hold me down and did not let me go. He twisted my arms so I couldn't—and he didn't let me get on my bed. Then after a few times later, he locked me—he holded the door so I couldn't get out. So he locked me up in my room even though I didn't have a lock[.]

During the parenting time interview, the child also disclosed that she and her father put their pajamas on together "every night" and sometimes she sees her father's "privates." "[S]ometimes I have to see dad's privates . . . [b]ecause he has to take off his clothes so he can get his pajamas on. I just have to." She explained that her bed is close to her father's bed upstairs in the bedroom. She then verified that her father is "naked" when putting on his pajamas, and she proceeded to describe his "privates" as: "a little mountain with two bumps on the sides. And then there's an oval and it goes like this, and the bottom of it is half of a circle, I mean a spear[;]" she also stated that his private region has "a lot" of hair. The child expressed embarrassment for her father and concern that someone might see him without clothes on, which would be "rude," but said it is "not too rude" for her to see him without clothes "because I'm his child." She also mentioned that she sometimes sees James's "privates" in the restroom because she is often in the restroom with him when he uses the toilet.

The evaluator determined that there were some "very disturbing boundary concerns" between James and the child regarding co-sleeping and privacy, which are "indicative of being enmeshed." The evaluator explained that this parent-child dynamic leads to "a lack of independence and personal autonomy in the child" and can "foster[] alienating behaviors[.]"

The evaluator also determined that James engages in confrontational, controlling behaviors indicative of an unwillingness to co-parent with Jillian. The PTE stated that James engaged in "controlling and critical exchanges" with Jillian, "dominating conversations, and insisting on having the final say in matters that affect the child." The evaluator also determined that James's "need for control has had negative consequences in the parents' ability to pursue services for the child[,]" noting that James feels the need to "vet" every provider referred by another provider or suggested by Jillian. The PTE recognized that the child's behavioral health records had documented James's "oppositional" attitude towards Jillian, displayed in front of the child, which has resulted in the child "becoming distressed." The evaluator concluded that "James's need to control every aspect of [Z.W.]'s life and parenting decisions is indicative of behaviors that will eventually lead to a disruption in the child's overall well-being" and "James'[s] behaviors are reflective of an unwillingness to coparent with the other party, nor does he seem to have the ability to separate his emotions from what's best for the child."

The PTE appreciated a concern regarding overnight visits for the child with her father "due to the inappropriate parental boundaries." The evaluator recommended that, while the parties should maintain joint legal and physical custody, Jillian should "have the final say in parental decisions related to all the child's healthcare needs, including mental health." The evaluator took no firm position on relocation, but provided alternative recommendations in the event relocation was granted and in the event it was not. In the event relocation was permitted, the evaluator recommended that James be permitted two, week-long periods of visitation, during school breaks. Regardless of whether Jillian was permitted to relocate, the evaluator recommended that all visits be daytime visits only and suggested that Jillian should travel with the child for any visitation outside of Australia in the event Jillian and the child relocated there.

**D.      Trial and magistrate court's subsequent decision**

The matters of the child's custody and relocation proceeded to trial over three days in February and March 2024. James and Jillian both testified at trial, and the PTE was admitted into evidence without objection from either party. On the first day of trial, February 16, 2024, James testified that he saw no problem with sleeping in the same room as the child, which he had been doing during the separation and intended to do until a final custody order was issued. However, during his rebuttal testimony on March 25, 2024, he testified that he was no longer sleeping in the same room as the child.

James also testified about the concept of "spiritual daughters," confirming that he has had "three or four." He testified that in these relationships, he provides "spiritual fathering" to people while they are going through difficult times or experiencing an "emotional deficit." He testified that while he tries to see his "spiritual daughters" in person, face-to-face, he had not engaged in sexual relations with any "spiritual daughter" other than Jillian. He explained that while the spiritual father-daughter relationship is "emotionally intimate," it would be "perverted" to engage in sexual relations with a spiritual daughter "because that person is trusting me, you would be taking advantage." He acknowledged he had another "spiritual daughter" (nick-named "dolphin girl"), whom he cuddled.

During Jillian's testimony, text messages between James and several of his spiritual daughters were admitted into evidence. Jillian testified that she found the text messages on an old cell phone she received from James in 2022. She concluded the text messages were between James and his spiritual daughters based upon her own interactions with James when she was his spiritual daughter and interactions she had witnessed between James and his other spiritual daughters. In these text messages, the spiritual daughters frequently referred to James as "Daddylove." James referred to himself as "DaddyLoveBunLove" and one spiritual daughter as "HoneyBunLoveBun." The text messages reference "hugs and kisses" and "cuddl[ing] her to sleep and cuddl[ing] her awake" during one spiritual daughter's planned trip to visit James. Jillian testified that there are similarities between the pattern in which James interacted with his spiritual daughters and his interactions with Z.W., noting that James claims he is "tickling" Z.W. when he is actually caressing her:

> [H]e runs his fingers gently, slowly up her arms and her body. She lies on the bed and she's like, "tickle me on my legs," and so he caresses up her legs, up her thighs, he does it on her tummy, he does on her shoulders, I've seen it at the doctor's office sitting next to it being grossed out because I know what it is. He did it to me when I was just his spiritual daughter lying on the bed, caressing, and my counselor said that's part of arousal that sort of behavior.

Jillian testified that Z.W. has had "problems at school as a result" of the tickling by doing the same to some of the boys in her class, "up and down their back."

Jillian's testimony also addressed what life would be like for the child should she be allowed to relocate to Australia. Jillian testified that she is a certified teacher in Australia and expects to get hired as an elementary school teacher at a school near her parents' home, earning approximately $90,000 U.S. per year. She testified that her entire family, including ten siblings,

live close to one another there so the child would have access to numerous aunts, uncles, cousins, and grandparents. She testified that the child would attend the same elementary school as one of her cousins, who is the same age and in the same grade.

Following the trial, the magistrate court issued its findings of fact and conclusions of law, awarding Jillian primary physical custody and awarding the parties' joint legal custody, except for educational and medical decisions, on which he awarded Jillian sole legal custody. The magistrate court granted Jillian permission to relocate with the child to Australia. The magistrate court noted that its decision was discretionary, guided by the factors set forth in Idaho Code section 32-717 regarding the best interests of the child. The magistrate court found that Z.W. is "positively bonded" to Jillian, but has "an unhealthy relationship" with James:

> [N]ot unlike his relationship with Jillian, [James] uses control and manipulation to influence [Z.W.] He has created an environment for [Z.W.] at his home where [Z.W.] now believes that only James can provide her safety. He has shared information about the parties' relationship and his emotions, which has caused [Z.W.] to have feelings of guilt, sadness, anxiety, along with anger towards Jillian. His co-sleeping with [Z.W.] has allowed for the child to be regularly exposed to seeing James naked. James has allowed [Z.W.] to see him naked so frequently that the child has now normalized seeing her father naked. James's influence and control over [Z.W.] has also led to alienation towards Jillian. Where the child now weighs Jillian's actions and compares it with whether James would approve of the behavior. This is seen in the nighttime song where [Z.W.] did not accept what Jillian sang because it did not conform with what James had established. James has also formed a companion-type relationship with [Z.W.], and uses her for emotional support.

The magistrate court also found that James's behavior with Z.W. is inappropriate and may leave her vulnerable to abuse:

> James conducts inappropriate activities with the child that have created confusion with the child in how to interact with others. James's "tickle" hide and seek game caused [Z.W.] to perform similar "tickling" with her classmates. James's conduct in bathing [Z.W.] also led to the need to have a forensic interview conducted with the young child. Several times at trial Jillian expressed that she did not have concerns that James might sexually abuse the child, the [c]ourt cannot agree with this sentiment and there are number of indicators that James is fostering an unhealthy relationship with his daughter. At a minimum, his relationship and behavior with the child is raising [Z.W.] to be vulnerable to abuse (whether from James or someone else).

The magistrate court concluded that the concerns with James's parenting, combined with the high level of parental conflict interfering with Z.W.'s counseling and James's troubling character, weighed heavily in favor of Z.W. relocating to Australia with her mother.

The magistrate court then considered factors related to Jillian's motivations to move to Australia and the impact the move would have on the child. The magistrate court found that Jillian wished to relocate to Australia with the child to return to her and her daughter's home country. The magistrate court concluded that the family support system in Australia, Jillian's ability to earn a higher income there, and the fact that both Jillian and the child are Australian citizens supported relocation.

The magistrate court then ordered that the parties shall share legal custody except as to educational and medical decisions, awarding Jillian sole custody of those matters. Jillian was granted permission to relocate with the child to Australia and was awarded primary physical custody. The magistrate court granted James two weeks of visitation during school breaks, between the hours of 9:00 A.M. and 8:00 P.M. each day, with any overnight visits left to Jillian's discretion. The magistrate court also granted James a minimum of thirty minutes of video calling each Saturday and Sunday. James sought and obtained permission to pursue a direct appeal to this Court pursuant to Idaho Appellate Rule 12.1(b).

## II. STANDARD OF REVIEW

"Child custody determinations are committed to the sound discretion of the magistrate judge." *Bartosz v. Jones*, 146 Idaho 449, 453, 197 P.3d 310, 314 (2008). Absent an abuse of discretion, the trial court's child custody determination will not be overturned. *Firmage v. Snow*, 158 Idaho 343, 347, 347 P.3d 191, 195 (2015). "A trial court does not abuse its discretion as long as the court recognizes the issue as one of discretion, acts within the outer limits of its discretion and consistently with the legal standards applicable to the available choices, and reaches its decision through an exercise of reason." *Id.* (quoting *Suter v. Biggers*, 157 Idaho 542, 546, 337 P.3d 1271, 1275 (2014)). "When the trial court's decisions affect children, the best interests of the child is the primary consideration." *Id.* (quoting *Suter*, 157 Idaho at 546, 337 P.3d at 1275). Consequently, in matters of child custody, "[a]buse of the trial court's discretion occurs only when the evidence is insufficient to support the conclusion that the interests and welfare of the minor children would be best served by a particular custody award or modification." *Biggers v. Biggers*, 103 Idaho 550, 555, 650 P.2d 692, 697 (1982).

## III. ANALYSIS

### A. The magistrate court did not abuse its discretion by allowing Jillian to relocate with the child to Australia.

James contends that the magistrate court abused its discretion by allowing Jillian to relocate with the child to Australia. In support of this contention, James argues that relocation contradicts the statutory presumption in favor of "frequent and continuing contact" between parent and child under Idaho Code section 32-717B, citing a dissenting analysis from *Bartosz v. Jones*, 146 Idaho 449, 464–65, 197 P.3d 310, 325–26 (2008) (Eismann, J., concurring in result). He also suggests the decision is not supported by substantial and competent evidence because the magistrate court's determination that James was not credible was "not an exercise of reason." Neither argument is availing.

1. *The presumption in favor of "frequent and continuing contact" between parent and child under Idaho Code section 32-717B does not create a presumption against relocation of a minor child.*

In support of his contention that the magistrate court erred in permitting Jillian to relocate to Australia with Z.W., James quoted the following portion of Justice Eismann's concurrence in *Bartosz* to suggest that the statutory presumption in favor of "frequent and continuing contact" is synonymous with a presumption against relocation:

> Idaho Code § 32-717B(4) declares, "[A]bsent a preponderance of the evidence to the contrary, there shall be a presumption that joint custody is in the best interests of a minor child or children." " 'Joint custody' means an order awarding custody of the minor child . . . to both parents and providing that physical custody shall be shared by the parents in such a way as to assure the child . . . of frequent and continuing contact with both parents." *King v. King*, 137 Idaho 438, 445, 50 P.3d 453, 460 (2002) (citation omitted). Joint custody also requires that each parent have physical custody for significant periods of time. I.C. § 32-717B(2).
>
> Section 32-717B(4) creates a presumption that it is in the best interests of a child that both parents have *frequent* physical custody of the child. Typically, in order for that to be able to occur, the child will have to be living in physical proximity to both parents.
>
> . . . Obviously, if there is a presumption in favor of joint custody, then there is a presumption against allowing one parent to move away with the child if the move would prevent the other parent from having frequent and continuing physical custody of the child. To hold otherwise would render the statutory presumption meaningless.

146 Idaho at 464, 197 P.3d at 325 (all but last alteration in original; emphasis in original; footnote omitted). James appears to suggest that, because the child's relocation to Australia with Jillian results in him having limited in-person contact with his daughter, the relocation violates the statutory presumption in favor of joint custody. This argument is without merit for two reasons.

First, James's suggestion contradicts the holding in *Bartosz* that "the presumption in favor of joint custody is not equivalent to a presumption against a custodial parent relocating with the child." *Id.* at 456, 197 P.3d at 317 (majority opinion). Second, the magistrate court cited the correct legal standard in its analysis by citing to Idaho Code section 32-717 and applying the proper legal standard from *Bartosz*.

We first emphasize that there is no presumption against relocation of a minor child. The quoted language from Justice Eismann's concurrence in *Bartosz*, suggesting otherwise, is in direct contradiction to the majority's reasoning and holding in the opinion. In *Bartosz*, a mother appealed the magistrate court's custody order, which denied the mother's request to relocate with the minor child to Hawaii. *Id.* at 453, 197 P.3d at 314. On appeal, the mother argued that the magistrate court erred by "apply[ing] an irrebuttable presumption against relocation." *Id.* at 458, 197 P.3d at 319. In affirming the magistrate court's decision, this Court first emphasized that "Idaho law does not impose a presumption against relocation." *Id.* at 456–58, 197 P.3d at 317–19. This Court explained that, while Idaho Code section 32-717B provides a presumption in favor of "frequent and continuing contact with both parents," it is within the trial court's discretion to determine precisely how much time each parent has with the child, or in other words, to define the frequency of contact:

> Under Idaho law, unless one parent is a habitual perpetrator of domestic violence, it is presumed that an award of joint custody serves a child's best interest. I.C. § 32-717B(1), (4) & (5). A court may award parents joint physical custody, joint legal custody, or both. *Id.* § 32-717B(1). An award of joint physical custody must assure that the child has "frequent and continuing contact with both parents," but this "*does not necessarily mean the child's time with each parent should be exactly the same in length nor does it necessarily mean the child should be alternating back and forth over certain periods of time between each parent.*" I.C. § 32-717B(2). . . . It is the province of the trial court to determine the amount of time the child spends with each parent. I.C. § 32-717B(2).
>
> The presumption in favor of joint custody is not equivalent to a presumption against a custodial parent relocating with a child. As discussed above, the best interest of the child standard governs relocation decisions. *See Roberts* [*v. Roberts*, 138 Idaho 401, 404, 64 P.3d 327, 330 (2003)]; *see also Ford v. Ford*, 108 Idaho 443, 445, 700 P.2d 65, 67 (1985). Once the parent seeking permission to relocate proves that relocation is in the child's best interest, he or she will be allowed to move with the child. *Roberts*, 138 Idaho at 405, 64 P.3d at 331.

*Id.* at 456–57, 197 P.3d at 317–18 (emphasis added) (footnote omitted). This Court then concluded the magistrate court did not erroneously apply a presumption against relocation but rather reached

its decision through an exercise of reason by considering all of the factors enumerated under Idaho Code section 32-717 regarding the best interest of the child. *Id*. at 458-59, 197 P.3d at 319-20.

In contrast, Justices Eismann and W. Jones, who concurred in the result reached by the majority, disagreed with that portion of the majority's analysis. *Id*. at 464, 197 P.3d at 325 (Eismann, J., concurring in the result). They argued that there *is* a statutory presumption against relocation; however, they recognized the presumption can be overcome with proof by the parent who wishes to move with the child that "it is in the child's best interest for the other parent *not* to have frequent and continuing physical custody of the child." *Id.* (emphasis added). In other words, Justice Eismann's concurrence suggested that relocation of the minor child should only be granted when it is in the child's best interest to have *limited* time with the non-moving parent. *Id*. Accordingly, James's argument on this issue is unavailing because it is based on a concurrence that did not gather a majority of votes from this Court.

Second, it is clear from the magistrate court's decision that it applied the correct legal standard. The magistrate court cited to Idaho Code section 32-717B, recognizing the "statutory presumption that joint custody is in the best interest of a minor child[.]" The magistrate court also recognized that its decision was discretionary, subject to consideration of the factors set forth in Idaho Code section 32-717 regarding the best interest of the child:

> **32-717. Custody of children – Best interest. –** (1) In an action for divorce the court may, before and after judgment, give such direction for the custody, care and education of the children of the marriage as may seem necessary or proper in the best interests of the children. The court shall consider all relevant factors which may include:
>
> > (a) The wishes of the child's parent or parents as to his or her custody;
> >
> > (b) The wishes of the child as to his or her custodian;
> >
> > (c) The interaction and interrelationship of the child with his or her parent or parents, and his or her siblings;
> >
> > (d) The child's adjustment to his or her home, school, and community;
> >
> > (e) The character and circumstances of all individuals involved;
> >
> > (f) The need to promote continuity and stability in the life of the child; and
> >
> > (g) Domestic violence as defined in section 39-6303, Idaho Code, whether or not in the presence of the child.

I.C. § 32-717(1). The magistrate court also quoted the legal standard for relocation provided by this Court in *Roberts*:

> [i]n any judicial determination regarding the custody of children, including where they reside, the best interests of the child should be the standard and primary consideration. In addition, Idaho favors the active participation of both parents in raising children after divorce, which policy is reflected in I.C. § 32-717B supporting joint custody. For these reasons, in Idaho, *the moving parent has the burden of proving relocation would be in the best interests of the child before moving in violation of a previous custody arrangement.*

(Emphasis and alteration by magistrate court) (quoting 138 Idaho at 405, 64 P.3d at 331). The magistrate then quoted the majority holding in *Bartosz* that there is no presumption against relocation under Idaho Code section 32-717 and, relying on *Wieland v. Ruppel*, explained that "relocation cases are fact driven cases" left to the discretion of the trial court so long as its decision "is supported by substantial evidence and results from the proper consideration of the facts pursuant to all relevant factors including those set forth in the statute[.]"(Quoting 146 Idaho at 457, 297 P.3d at 318; and 139 Idaho 122, 125, 75 P.3d 175, 179 (2003)). The magistrate court then proceeded to analyze all the factors listed above in Idaho Code section 32-717, as well as additional factors specifically related to relocation, including Jillian's motives behind the proposed move and the fact that both Jillian and Z.W. have dual citizenship in Australia and the United States. The magistrate court concluded that relocation to Australia was in the best interest of the child because, among other reasons, "*limiting* the contact between James and [the child] is beneficial to [the child] given the unhealthy dynamic of their relationship." (Emphasis added.) Thus, the magistrate court applied the correct legal standard regarding relocation.

2. *Substantial and competent evidence supports the magistrate court's conclusion that relocation to Australia with Jillian is in Z.W.'s best interest.*

James's next argument appears to suggest that the magistrate court's decision to permit Jillian to relocate to Australia with Z.W. was not based on substantial and competent evidence. In support of this argument, James states that he "believes the [m]agistate [c]ourt's decision . . . places undue emphasis, almost an unnatural emphasis, on the perceived peculiarities of his religious beliefs and practices," referring to James's practices with his spiritual daughters. He also argues that, while the magistrate court's decision may be based on concerns regarding James's "grooming" behaviors, it was improper for the court to "prioritize [these] allegations" given: (1) the outcome of the child protection investigation (CPI); (2) James's testimony that he was no longer sleeping in the same room with Z.W.; and (3) Jillian's testimony that she understood Z.W. was now sleeping in a separate bedroom at James's house. James recognizes that the magistrate court did not find his testimony credible but argues that the finding "was not an exercise of reason."

In essence, James argues that the magistrate court overemphasized certain aspects of his past conduct at the expense of his positive parenting attributes and further argues that, even if the past conduct was still occurring, it would not be sufficient grounds for the magistrate court to permit the child to relocate to Australia with her mother. We disagree.

James states that he "believes" the magistrate court "undu[ly] emphasi[zed]" James's religious practices with his spiritual daughters, and he "believes" the magistrate court would not "have reached the same decision in the absence of [those] religious beliefs and practices." However, the magistrate court's findings regarding James's religious practices with his spiritual daughters do not reflect that it gave undue emphasis to "the peculiarities of [James's] religious beliefs and practices." Rather, the magistrate court found that James *took advantage* of his position as a spiritual father "to foster, or attempt to foster, romantic relationships." This is supported by James's own testimony that it would be "perverted" to engage in sexual relations with a spiritual daughter because it would be "taking advantage" of that relationship and the position of trust, combined with the undisputed fact that James engaged in sexual relations with Jillian, his spiritual daughter. Moreover, James's own text messages established that he engaged in a physical relationship with at least one other spiritual daughter when he cuddled her to sleep and awake. The magistrate court concluded that this created concerns with James's parental relationship with the child and concerns regarding James's character, as considered under Idaho Code section 32-717(1)(c) and (e), because he had engaged in "inappropriate communications and inappropriate touching" with his other spiritual daughters in a manner that "is consistent with how he interacts with his own daughter[.]" Thus, we reject any contention that the magistrate court's findings and conclusions of law reflect prejudice towards James's religious beliefs. Its factual findings regarding James's conduct towards his spiritual daughters are supported by substantial and competent evidence.

Next, James's argument that the magistrate court did not exercise reason when it "prioritize[d]" concerns regarding "grooming behaviors" and disbelieved James about his sleeping arrangement with the child is a thinly veiled request for this Court to reweigh the evidence. James argues the magistrate court's factual findings contradict the CPI report; however, a copy of this report was not included in the record on appeal. "The party appealing a decision of the [trial] court bears the burden of ensuring that this Court is provided a sufficient record for review of the [trial] court's decision." *Est. of Ekic v. Geico Indem. Co*., 163 Idaho 895, 897–98, 422 P.3d 1101, 1103–

04 (2018) (alterations in original) (quoting *Gibson v. Ada County*, 138 Idaho 787, 790, 69 P.3d 1048, 1051 (2003)). "In fact, if the Appellant fails to comply with this duty, 'this Court will presume that the absent portion supports the findings of the [trial] court.' " *Id.* at 898, 422 P.3d at 1014 (alteration in original) (quoting *Gibson*, 138 Idaho at 790, 69 P.3d at 1051). In addition, "[a]ppellate courts are not permitted to substitute their own view of the evidence for that of the trial court, or to make credibility determinations." *Wilde v. Wilde*, ___ Idaho ___, ___, 556 P.3d 830, 836 (2024). "We reaffirm the oft-cited maxim that appellate courts in Idaho do not reweigh evidence." *Wilson v. Mocabee*, 167 Idaho 59, 68, 467 P.3d 423, 432 (2020). "Instead, we defer to the trial court's unique ability to 'accurately weigh the evidence and judge the demeanor of the witnesses' while taking into account the trial court's 'superior view of the entire situation.' " *Id.* (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 866–67, 421 P.3d 187, 197–98 (2018)).

Importantly, the magistrate court had the CPI report available for its review, as well as the PTE that referenced the CPI and expressed the evaluator's own concerns regarding James's lack of self-awareness regarding his conduct with his daughter and appropriate boundaries. The magistrate court was also able to judge James's demeanor at trial when he provided different statements regarding his intentions surrounding co-sleeping: he first testified that he intended to keep doing so until all custody matters were resolved—consistent with statements made to the parenting time evaluator—then, approximately a month-and-a-half later, on the final day of trial, testified that he was no longer co-sleeping with the child. James did not testify that he understood the evaluator's concerns regarding co-sleeping, privacy issues, or a lack of boundaries. It was within the magistrate court's discretion, as the fact finder, to determine James was not credible on the co-sleeping issue and to find continued concerns surrounding a lack of boundaries and inappropriate behavior with his daughter. Jillian's testimony that, to her knowledge, at the time of trial, the child was sleeping on a futon in a separate room from James does not negate these findings. Accordingly, we will not disturb those findings on appeal by reweighing the evidence presented to the magistrate court.

In conclusion, James has failed to demonstrate how the magistrate court abused its discretion in concluding that relocation to Australia with her mother was in the child's best interest. The magistrate court's decision to permit relocation was reached after more than fifteen pages of factual findings and an additional ten pages of thorough discussion of each factor under section

32-717 regarding the best interests of the child. The magistrate court also analyzed additional factors that this Court identified in *Roberts* as specifically pertaining to relocation, including the moving parents' motives behind the relocation, the citizenship of the moving parent and child, the presence of supportive family members in the new location, and the ability of the non-moving parent to have continued contact with the child. The magistrate court recognized that, "[g]iven the distance between Idaho and Australia, the cost and time to travel, [and] the time difference, James's contact would be more limited than it is now." However, the magistrate court concluded that "limiting contact between James and [the child] is beneficial to [the child] given the unhealthy dynamic of their relationship." The magistrate court also emphasized that James could maintain contact with the child apart from in-person visitation through phone or video calling. The magistrate court also discussed that its order would allow Jillian and the child to return to their home. In support of this discussion, the magistrate court relied on the facts that James met and married Jillian in Australia, where Jillian was from and where her entire family still remains, and that the child was born there. There is no error with these conclusions. Accordingly, we affirm the magistrate court's decision to permit Jillian to relocate to Australia with the child.

**B.     The magistrate court did not abuse its discretion in limiting James's physical custody and/or visitation with the child.**

James next contends the magistrate court abused its discretion in limiting his physical custody or visitation with the child to two weeks a year, without any overnight visits. In support of this contention, James repeats his argument that the magistrate court's decision was inconsistent with the presumption in favor of joint custody under Idaho Code section 32-717B and "frequent and continuing contact," I.C. § 32-717B(2). However, James's argument here fails because substantial and credible evidence supported the magistrate court's decision to restrict his parenting time.

Section 32-717B(4) of the Idaho Code provides a presumption in favor of joint custody that can be overcome "by a preponderance of the evidence" that joint custody is not in the best interest of the minor child. I.C. § 32-717B(4). Section 32-717B(2) defines "joint physical custody" as "an order awarding each of the parents significant periods of time in which a child resides with *or is under the care and supervision of each of the parents or parties*." I.C. § 32-717B(2). (emphasis added). Notably, the amount of physical custody time awarded to each parent under "joint physical custody" is not defined by statute but is determined by the court:

> Joint physical custody shall be shared by the parents in such a way to assure the child a frequent and continuing contact with both parents but does not necessarily mean the child's time with each parent should be exactly the same in length nor does it necessarily mean the child should be alternating back and forth over certain periods of time between each parent.
>
> The actual amount of time with each parent shall be determined by the court.

I.C. § 32-717B(2).

In this case, the magistrate court awarded joint physical custody to both parents, granting Jillian primary physical custody and ordering that James have two weeks of visitation during one of the child's school breaks, between the hours and 9:00 A.M. and 8:00 P.M. each day. Thus, the magistrate court specified a period of time—two weeks, during the daytime hours—during which Z.W. is "under the care and supervision" of James, in accordance with the definition of "joint physical custody" under Idaho Code section 32-717B(2). Accordingly, the magistrate court acted consistently with the law regarding physical custody.

Moreover, the magistrate court's fifteen pages of factual findings outlining boundary issues, enmeshment, controlling conduct, and an unhealthy parental relationship, along with the magistrate court's extensive analysis of all the factors under section 32-717, were supported by substantial and competent evidence and provided ample support for its decision. In addition, the magistrate court also considered the PTE recommendations that, in the event relocation was permitted, James be allowed two weeks of visitation, and further recommended that regardless of whether Jillian and the child relocate, James not be permitted to have overnight visits with the child. Accordingly, there is no error in the magistrate court's decision to limit James's physical custody and/or visitation with the child.

## C. The magistrate court did not abuse its discretion by awarding Jillian sole legal custody in the areas of educational and medical decisions.

For the same reasons that James contends the magistrate court abused its discretion regarding relocation and allocation of parenting time with Z.W., James contends the magistrate court abused its discretion by awarding Jillian sole legal custody in the areas of educational and medical decisions. And for the same reason, James's argument fails: the magistrate court's decision was supported by substantial and competent evidence that sole legal custody in these areas is in the best interests of the child.

James's appellate brief states that he "believes the record shows he is a fit and capable parent." In support, James points to a statement in the PTE noting that he "prides [himself] in being

able to teach and guide [Z.W.] in her daily learning, involving reading, writing, and mathematics[.]" This statement does not contradict any of the magistrate court's findings. The magistrate court made no findings regarding James's participation in Z.W.'s learning. Moreover, the quoted statement from the PTE refers to James's point of view or opinion regarding his parenting strengths; it is not a conclusion by the evaluator. Importantly, the PTE recommended "that Jillian have the final say in parental decisions related to all the child's healthcare needs, including mental health."

Although the PTE did not make a specific recommendation regarding educational decisions, it did note that there is a high level of conflict between the parents. The PTE concluded that James "attempt[s] to undermine Jillian's efforts to coparent[,]" "attempts to make unilateral decisions," "dominate[s] conversations," and "insist[s] on having the final say in matters that affect the child." The PTE also noted that James's controlling behavior has negatively impacted the child, hindering the "ability to pursue services for the child[,]" ultimately concluding that James'[s] "behaviors are reflective of an unwillingness to coparent with the other party."

Consistent with the PTE, the magistrate court made similar factual findings regarding James's need for control and inability to coparent. The magistrate court found that James did not approve of the child being evaluated for ADHD and "was more concerned that [the child] would be 'labeled.' " In analyzing "the interaction and interrelationship of the child" with James pursuant to Idaho Code section 32-717(1)(c), the magistrate court concluded that, whereas "Jillian's primary concern is that [the child] obtains the care and treatment that will help her be successful in life[,] . . . James's concern stems more on how [the child] might be labeled and how that makes him feel." James does not challenge these factual findings on appeal. Rather, he suggests that his "belief" that he is "a fit and capable parent" indicates that the magistrate court "lacked 'substantial and competent evidence' " to conclude that Jillian's sole custody in educational and healthcare matters is in the child's best interests. Similar to James's argument regarding the magistrate court's decision to permit relocation, James's argument here is an invitation for this Court to reweigh the evidence. We decline to do so. *See Wilson v. Mocabee*, 167 Idaho 59, 68, 467 P.3d 423, 432 (2020) ("We reaffirm the oft-cited maxim that appellate courts in Idaho do not reweigh evidence.").

Accordingly, we affirm the magistrate court's decision to award sole legal custody to Jillian as to educational and healthcare decisions.

**D.      Jillian is awarded attorney fees on appeal.**

Jillian requests attorney fees under Idaho Code section 12-121, or alternatively as a sanction under Idaho Appellate Rule 11.2, arguing "James has frivolously pursued this appeal because he is merely requesting that this Court second guess the trial court on the weight of the evidence," citing *Kelly v. Yadon*, 150 Idaho 334, 338, 247 P.3d 199, 203 (2011). Jillian also argues that James pursued his appeal "without a basis in fact or law," citing *Manwaring Investments, L.C. v. City of Blackfoot*, 162 Idaho 763, 774, 405 P.3d 22, 33 (2017).

Section 12-121 of the Idaho Code authorizes an award of attorney fees to the prevailing party if the case was "brought, pursued or defended frivolously, unreasonably or without foundation." I.C. § 12-121. "Under I.C. [section] 12-121, a party is entitled to attorney[] fees if the appeal merely invites the appellate court to second guess the trial court on the weight of evidence." *Crowley v. Critchfield*, 145 Idaho 509, 514, 181 P.3d 435, 440 (2007) (citing *Anderson v. Larsen*, 136 Idaho 402, 408, 34 P.3d 1085, 1091 (2001)). In *Anderson*, this Court awarded fees to the prevailing party under section 12-121 after concluding that "the Andersons essentially have asked this Court to reweigh and reevaluate the evidence, to second-guess the trial court's findings which were based on conflicting evidence, and to arrive at a different conclusion than the district court by reassessing the credibility of the various witnesses." 136 Idaho at 408, 34 P.3d at 1091.

Under Idaho Appellate Rule 11.2, this Court may impose "an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the notice of appeal, petition, motion, brief or other document including a reasonable attorney's fee." I.A.R. 11.2(a). Sanctions imposed under the rule may be imposed against a party, its attorney, or both. *Id.* Sanctions are appropriate "when a party or attorney violates either (a) the frivolous filings clause or (b) the improper purpose clause." *Hartgrave v. City of Twin Falls*, 163 Idaho 347, 357, 413 P.3d 747, 757 (2018) (citation omitted). "The frivolous filings clause of Rule 11.2 applies under the same circumstances warranting an award under Idaho Code section 12-121." *Frost v. Gilbert*, 169 Idaho 250, 273, 494 P.3d 798, 821 (2021).

We agree with Jillian that James "brought this appeal frivolously, unreasonably, and without foundation." *Lamont v. Lamont*, 158 Idaho 353, 362, 347 P.3d 645, 654 (2015). In *Lamont*, we awarded attorney fees on appeal to the prevailing mother in a custody dispute after concluding the magistrate court had done "an exceptional job of carefully and thoughtfully deciding th[e] case

within the applicable legal standards" and the father's appeal had not presented "any genuine issues of law or legitimate issues of fact[.]" *Id.* at 362–63, 347 P.3d at 654–55. The same circumstances are present here. The magistrate court issued an extensive written memorandum, consisting of over fifteen pages of factual findings and ten pages of analysis on each enumerated factor under Idaho Code section 32-717, as well as additional factors pertaining to relocation, to reach a decision regarding the best interest of the minor child. This case is similar to *Anderson*, in that James's appeal is essentially a request for this Court to reweigh the evidence, second guess the magistrate court's credibility determination, and reach a different conclusion than the magistrate court on custody matters within its discretion. This warrants an award of attorney's fees under section 12-121.

We recognize that an award of attorney fees is discretionary, and this Court has declined to award fees to the prevailing party in custody matters based on the conclusion that the non-prevailing party has nevertheless brought the appeal under "a good faith belief that the trial court had abused its discretion in failing to expressly analyze the best interests of the children in written findings of fact and conclusions of law." *Firmage v. Snow*, 158 Idaho 343, 351, 347 P.3d 191, 199 (2015). Although this Court ultimately affirmed the magistrate court's decision in *Firmage*, concluding the custody modification was supported by substantial and competent evidence, "we temporarily remanded the case to the magistrate court to issue written findings as to the best interest of the children." *Id*. at 346, 347 P.3d at 194. Accordingly, there was, at least initially (until the revised written decision was issued), a legitimate concern that the magistrate court had failed to explain its reasoning, thereby providing a good-faith basis for an abuse of discretion argument on the fourth prong of the *Lunneborg* test, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

This case is different. The magistrate court issued a thorough, extensive written decision with multiple pages of factual findings and conclusions of law under each factor of Idaho Code section 32-717. There is no legitimate concern that the magistrate court failed to explain the reasons for its decisions. Accordingly, Jillian is awarded attorney fees as the prevailing party under Idaho Code section 12-121 and costs pursuant to Idaho Appellate Rule 40.

## IV.  CONCLUSION

For the foregoing reasons, we affirm the magistrate court's decision and child custody order. Attorney fees and costs on appeal are awarded to Jillian pursuant to Idaho Code section 12-121 and Idaho Appellate Rule 40.

Chief Justice BEVAN, and Justices MOELLER, ZAHN and MEYER CONCUR.