IN THE SUPREME COURT OF THE STATE OF IDAHO

Docket No. 52418

| | | |
|---|---|---|
| BONITA SUE STEPHENS,<br>fka BONITA SUE BUELL,<br><br>    Petitioner-Appellant,<br><br>v.<br><br>DOUGLAS VIRGIL BUELL,<br><br>    Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Boise, February 2025 Term**<br><br>**Opinion filed: April 30, 2025**<br><br>**Melanie Gagnepain, Clerk** |

Appeal from the Magistrate Court of the Fifth Judicial District of the State of Idaho, Jerome County. Stacey DePew, Magistrate Judge.

The judgment of the magistrate court is <u>affirmed</u>.

Lawson Laski Clark, PLLC, Ketchum, for Appellant. Katie Franklin argued.

Migliuri & Rodriguez, PLLC, Twin Falls, for Respondent. Patricia M. Migliuri argued.

_____

MOELLER, Justice.

This is a child custody case we have taken on expedited appeal. Bonita Sue Stephens (formerly known as Bonita Sue Buell) ("Mother") and Douglas Virgil Buell ("Father") were married and had two sons. Mother filed for divorce in 2015. The magistrate court granted the parties a decree of divorce in the fall of 2017, while reserving the contentious child custody issues for a trial. In the spring of 2018, the magistrate court held a multi-day trial on the issue of child custody. Thereafter, the magistrate court entered an order ("2018 Custody Order") providing Mother with primary physical custody of the children, subject to Father's visitation every other weekend during the school year and alternating weeks during the summer. The parties were granted joint legal custody of the children. Additionally, the magistrate court ordered that the parties work with a parenting coordinator.

On November 2, 2021, Father sought a modification of the 2018 Custody Order. He alleged that a substantial and material change in circumstances had occurred since the original custody order due to Mother's dishonesty and refusal to comply with the 2018 Custody Order. He requested

1

sole legal and physical custody of the children. After years of litigation, culminating in an eight-day trial, the magistrate court entered a memorandum decision and order ("2024 Custody Order") granting Father sole legal and physical custody of the children. Mother requested permission to appeal the 2024 Custody Order directly to the Idaho Supreme Court pursuant to Idaho Appellate Rules 12.1 and 12.2, which the magistrate court granted.

## I. FACTUAL BACKGROUND

This case concerns Father's petition for a modification of the 2018 Custody Order.[1] We begin by noting that the facts and record in this case are extensive. For example, the 2024 Custody Order consists of 97 pages of which 70 pages contain the magistrate court's findings of fact. The 2018 Custody Order consists of 163 pages with 115 pages dedicated to the court's factual findings. Likewise, most of the parties' briefing on appeal was dedicated to recounting the disputed facts in the record, much of which was merely a reiteration of the positions previously taken below. While mindful of the extensive background and emotion that comprises this case, in this opinion we will narrow our focus to the facts most pertinent to this appeal.

Mother and Father were married in 2002 and had two sons, "Older Son" (born in 2009) and "Younger Son" (born in 2013). In 2015, Mother filed a petition for divorce and extensive litigation ensued. Eventually, in the fall of 2017, the magistrate court granted the parties a decree of divorce. In April 2018, the magistrate court divided the parties' respective community property and debts, while reserving the contentious custody dispute for another day. In July 2018, following an eight-day trial on the issue of child custody, the magistrate court entered its 2018 Custody Order followed by a final judgment. The magistrate court ordered that Mother would have primary physical custody of the children, subject to Father's visitation every other weekend during the school year, and alternating weeks during the summer break from school, in addition to an alternating holiday schedule. It also required the parties to utilize a parenting coordinator and set forth detailed instructions for conducting medical visits.

In rendering its decision, the magistrate court sought to resolve the ongoing "battle for control" between the parents. The 2018 Custody Order noted: "This [c]ourt firmly believes that the better method is to essentially neuter each party of any ability of control over the other in setting defined requirements and procedures as to the custodial environment of the children; in

---

[1] Magistrate Judge Thomas H. Borresen presided over the initial divorce and custody case. However, the custody modification action that is the subject of this appeal was heard by Magistrate Judge Stacy DePew.

other words, to make everything as black and white as possible." For this reason, the magistrate court set forth specific requirements for the parties consistent with its factual findings. These specific requirements are relevant to this appeal, as the petition for modification stems, in part, from Mother's alleged noncompliance with the 2018 Custody Order. Thus, it is necessary to examine the 2018 Custody Order in more detail.

### A. The 2018 Custody Order.

The magistrate court ordered both Father and Mother to attend counseling. Pertinent to this appeal, the court determined that "a preponderance of the evidence" showed that Mother "has had and/or does suffer from some form of Factitious Disorder,[2] the extent and continuance of which has been disputed by the parties as well as the experts." This condition "primarily exhibited itself in [Mother]'s misinformation and actual fabrication of various illnesses of herself and the children." The court found that Mother "was exaggerating and misrepresenting not only her medical history but also [that] of the children in the reports of 50 blood transfusions, trips to Primary Children's hospital, cancer, leukemia and all of the other conditions she claimed she or the children endured which have been shown not to exist." However, the court noted that Mother was not, at the time, exposing the boys to excessive or unnecessary medical appointments. Mother also made numerous accusations against Father (including allegations of sexual abuse, kidnapping, paying off the judge, and assault), "none of which ha[d] any factual basis." As a result of these findings, the magistrate court ordered Mother to

> continue with her current therapist, Troy Bishop, and such therapy will focus on how to coordinate with the father in co-parenting and how to specifically and consistently support the children's relationship with their father which includes learning how to genuinely understand the value of his role with them and how to have the children experience her valuing the father's role. Although this [c]ourt has not restricted [Mother] from making medical decisions, [Mother] shall obtain individual counseling with someone with experience in Factitious Disorder/Munchausen by Proxy to provide counseling in this area as to the absolute necessity of being factual in reporting symptoms, conditions and other observations about her own health needs or the needs of the children. If Troy Bishop certifies in

---

[2] Factitious Disorder, also known as Munchausen syndrome, is a mental health condition in which patients "fabricate illness, injury or impairment for psychological reasons." Gregory P. Yates & Marc D. Feldman, *Factitious Disorder: a Systematic Review of 455 Cases in the Professional Literature*, 41 Gen. Hosp. Psychiatry, 20, 20–28 (Jul-Aug 2016). Relevant to this case, factitious disorder imposed on another can occur when a caregiver induces or feigns an illness in a child to gain attention for themselves; this was formerly known as Munchausen Syndrome by Proxy. Christopher Bools et al., *Munchausen Syndrome by Proxy: A Study of Psychopathology*, 18 Child Abuse & Neglect 773, 773–88 (Sept. 1994).

writing that he has the experience to provide this counseling then he shall be able to provide the same. If therapists with such expertise are not locally available, [Mother] will utilize Skype or other live electronic medium with such non-local expert. . . . This therapy will continue for such time as is necessary and can only be concluded by a written statement of such therapist that their therapy services are no longer needed and that such written statement must be sent to the Parenting Coordinator to get their approval of the stoppage of such therapy and/or by order of the court.

The 2018 Custody Order directed that the children were to continue counseling with their current counselor, Melissa Osen, and ordered that "neither party shall communicate or discuss any matters with Ms. Osen unless requested by her to do so." The magistrate court ordered that a parenting coordinator be appointed, to be selected by mutual agreement of the parties.

Additionally, the magistrate court ordered that a full and accurate medical history be compiled for the children. The court also was very specific about how the parents should handle future medical appointments for the children:

The on-duty parent shall make all necessary day-to-day medical or other health related decisions involving the health of the minor children including appointments and administration of prescribed or over-the-counter medication. In the absence of an emergency, any medical or health related procedure which involves hospitalization, surgery, or other similarly invasive processes shall be jointly made by both parents and if not agreed upon such shall be submitted to the Parenting Coordinator who may select who is authorized to conduct such health care treatment as provided for in Section C(2)(q). The medical appointments for the children shall be primarily limited to St. Luke's Medical Center unless unavailable with the back-up facility to be Physician's Immediate Care with all dental matters to be with Twin Falls Dental. Both parties are ordered to immediately notify the other parent by e-mail once a medical appointment is made giving the other the date and time of such appointment. Either party may at their discretion allow the children to have chiropractic treatments but each party making such appointment shall immediately notify the other by e-mail as to the date and time of such appointment. Both parties shall insure [sic] that for any health-related facilities mentioned herein (St. Luke's Medical Center, Physician's Immediate Care, Twin Falls Dental or Neilson Chiropractic), that both parents are identified as such in that facility's records and that each parent has the direct right (not through attorneys) to access to all medical records of the children.

**B. Post-2018 proceedings.**

Following the 2018 Custody Order, the parties initially could not agree upon a suitable parenting coordinator until February 21, 2019, at which point Darci Moreno was settled on and later appointed by the magistrate court. Ms. Moreno subsequently submitted multiple "decisions"

4

and reports to the magistrate court. In November 2020, Mother filed a motion for the removal of Ms. Moreno as the parenting coordinator, alleging that Ms. Moreno was biased against her. The magistrate court denied the motion. In November 2021, Father filed the present petition to modify custody, seeking sole legal and physical custody of the children. Mother opposed the petition. During this period, "various [parenting coordinator] decisions, objections to those decisions, and other motions were being filed."

In July 2022, Mother filed a second motion seeking to replace Ms. Moreno with a different parenting coordinator. The magistrate court again denied the motion and ordered that Mother pay Father's attorney fees. The court also required Mother to post a $5,000 bond with the court prior to filing any further motions to remove or substitute the parenting coordinator. Mother then filed a motion for temporary custody seeking to "prevent Father from allowing the boys to drive farm equipment 'unsupervised' and ordering Father to feed the children regular and nutritious meals." Mother had reported these concerns to the Idaho Department of Health and Welfare, which investigated and determined that Mother's claims were unsubstantiated. The magistrate court denied the motion for temporary custody.

## C. Trial on Father's motion to modify.

Father moved to modify custody in November 2021. Father argued that Mother had failed to follow the provision in the 2018 Custody Order requiring her to attend counseling for her factitious disorder. Father also cited two reports from Ms. Moreno recommending that Father should be awarded sole custody of the children if Mother failed to obtain treatment, as ordered by the court. Father also raised concerns about the number of medical appointments to which the children were being subjected, as well as the lack of notice he was provided about such appointments. Father alleged that Mother's continued dishonesty in general, coupled with the lack of accountability for disregarding the 2018 Custody Order, had a detrimental effect on the children. Mother contested these allegations, and raised numerous allegations against Father in return.

The court conducted an eight-day trial on Father's motion in July 2023. For the sake of brevity, the following is a summary of key evidence adduced at trial, along with a brief synopsis of the magistrate court's relevant findings in its 97-page memorandum decision.

### 1. The Frontier Pediatric visit

A key issue at trial was Mother's visit to Frontier Pediatric with Younger Son in 2019. Mother took Younger Son to Frontier Pediatric without notifying Father, even though it was not

one of the approved medical providers set forth in the 2018 Custody Order. Frontier Pediatric's medical records show that during the visit, Mother made the following statement to the staff: "Mom states she is a little concerned about abuse . . . . Mom states that dad abused a 2 year old [sic] foster/adopted child and the child died." Consequently, Younger Son was questioned about possible abuse at that appointment by employees of Frontier Pediatric. At trial, the evidence revealed Mother's statement to Frontier Pediatric to be completely false.

When confronted with the medical record from Frontier Pediatric, Mother gave conflicting testimony as to why she took Younger Son to an unapproved medical provider and why she did not inform Father of the visit. Moreover, Mother attempted to "clarify" that Father had merely been accused of child abuse, and that while the foster child had died, the death occurred long after the child had left their care. Mother also noted that she had called Frontier Pediatric to "correct" the report; however, she only did so after she became aware that her initial false report had become an issue in this proceeding.

The magistrate court found that Mother's testimony on the matter was not credible, and that her changing accounts typified her dishonesty. It noted that the incident negatively impacted at least one of the children, causing Younger Son to hear false allegations against his father and to be subjected to questioning about potential abuse. The court also found that Mother had violated the 2018 Custody Order's directive to inform Father of each medical visit and to only take the children to the medical providers specified in the order.

*2. Mother's story about the foster child's death and organ donation*

The child that Mother and Father had fostered before the boys were born became the basis for another issue at trial. Mother testified that, at one point during her custodial time with the boys, she received a call from a hospital as an emergency contact for the foster child, informing her of the foster child's death and asking her to consent to the donation of the child's organs. Mother testified that she provided consent for the organ donation over the phone. However, Father testified that Mother had completely fabricated this story, and that it caused discord amongst the boys. In the 2024 Custody Order, the magistrate court found that Mother's story was entirely uncredible, caused significant confusion and conflict between the boys, and "led to the[m] fighting over which one of them was grieving appropriately for a foster sibling they had never met."

### 3. Mother's employment records

Portions of Mother's personnel file from her previous employer, Idaho Home Health and Hospice, were admitted as evidence in this case. The magistrate court admitted the file over Mother's objections. The file contained information tending to show Mother's reputation for being dishonest and manipulative. For example, the file contained numerous reports from other employees describing Mother's behavior, and included incidents showing that Mother made up stories while at work. This included stories about "having to identify a former patient's body after a fire, about her father having emergency surgery, being in one location when she wasn't, about a care facility quarantining employees due to [COVID-19], among other stories." The magistrate court found the file to be probative of Mother's pattern of dishonesty.

### 4. Unauthorized changing of dental providers

The 2018 Custody Order specified that the children were to be taken to Twin Falls Dental for dental care. In 2019, Mother sent an email to Father and Ms. Moreno requesting to change dentists, indicating that Twin Fall Dental was "going out of business and even if it did not go out of business, they had cancelled appointments and not been available at times she had taken the boys for dental appointments." Beyond this email, there was no further communication on the matter. Eventually, Father discovered that the boys had been seeing another dentist when they informed him that they had a cleaning scheduled. Father had not been notified of this appointment, or the change from Twin Falls Dental. Father went into the new dentist office and confronted the dentist, demanding information regarding the boys and all their appointments. Father later testified that Twin Falls Dental did not go out of business, and that he was not notified of the appointments, despite Mother scheduling them months in advance.

The magistrate court found that this again reflected Mother's lack of honesty and her failure to properly inform Father of medical appointments, as required by the 2018 Custody Order. The court noted that Mother simply mentioned she desired to change dentists and then "for *years* fail[ed] to tell Father about the dental appointments and the new dentist." (Emphasis in original).

### 5. Testimony of Dr. York

Mother presented the expert testimony of Dr. Leah York concerning her factitious disorder. Dr. York had examined Mother and determined that Mother only met three of the four criteria to be formally diagnosed with factitious disorder. Dr. York noted that "[Mother]'s exaggerations and

misrepresentations of her and the children's medical conditions and allegations against her ex-husband are more suggestive of maladaptive characterological traits."

The magistrate court ultimately found that Dr. York's testimony was deserving of little weight. It noted that the only information Dr. York used for her evaluation was provided by Mother herself. The court found that the evaluation was based on "limited information as to Mother's current behaviors and allegations of dishonesty." The court noted that Dr. York did not "actually investigate" the truthfulness of the claims Mother had made when seeking to determine whether Mother was being dishonest. The court detailed many instances of dishonesty that Dr. York did not consider because Mother failed to provide her with such information. For all these reasons, the magistrate court concluded that it would not assign as much weight to Dr. York's opinion as Mother wished.

*6. Past parenting time evaluations*

Multiple parenting time evaluations were conducted during the initial divorce and custody proceedings. Mother offered two such evaluations as evidence in this case. While the reports are extensive, a few things are important here: both evaluations recognized that Mother had been dishonest and made numerous misrepresentations, especially as it pertained to medical issues. Both evaluations recommended Mother receive treatment for her frequent dishonesty. One evaluation recommended Father have sole legal custody to make medical decisions for the children.

*7. Mother's counseling*

As previously noted, the 2018 Custody Order required Mother to obtain counseling with someone experienced in treating factitious disorder. The magistrate court concluded that, "[i]nstead of doing as she was clearly directed, Mother spent **_years_** refusing to comply." (Emphasis in original). The court noted that Mother waited until May 2022 before she began to see a counselor, Jason Beard. However, the court determined that the counseling Mother received from Mr. Beard did not meet the criteria set forth in the 2018 Custody Order.

**D. The 2024 Custody Order.**

After considering the evidence, the magistrate court ultimately determined that there had been a material, permanent, and substantial change in circumstances that warranted a change to the 2018 Custody Order. The court found that the children were negatively impacted by Mother's failure to attend counseling for factitious disorder, her refusal to inform Father of medical appointments, and her failure to take the children to the court-ordered medical providers. After

8

considering the factors set forth in Idaho Code section 32-717, the court concluded that it was in the best interests of the children that Father be granted sole legal and physical custody. The court emphasized that Mother's pattern of dishonest behavior directly and negatively impacted the children. It noted that Mother had "continuously fabricated medical issues, failed to inform Father of medical issues and coached the boys as to their medical symptoms." Additionally, the court noted that Mother had refused to follow the 2018 Custody Order and this noncompliance prevented the parties from co-parenting in a healthy way. Specifically, the court found that Mother had not obtained counseling for her dishonesty, as was clearly ordered in the 2018 Custody Order. Mother also made constant unsubstantiated allegations against Father, which caused hardship to the children; however, Mother refused to acknowledge the detrimental impact of her behavior and, instead, merely blamed Father.

On September 23, 2024, the magistrate court entered its Partial Judgement, which incorporated the findings made in its memorandum decision. The magistrate court granted Father sole legal and physical custody of the children, with Mother having visitations every other weekend from Friday to Sunday evening. Mother was permitted to have a supervised phone call with the children every evening that she did not have physical custody.

The magistrate court also severely limited Mother's ability to make medical decisions for the children: "Mother shall have no ability to seek medical care for the children. This means that Father is ordered to always be readily available when the children are in Mother's care." If the children become ill when in Mother's care, she "is ordered to contact Father immediately to determine what the next steps should be. Should Mother seek medical care for the children without the full knowledge and consent of Father[,] visitation with Mother shall cease until further order of the court." However, if it was established that emergency medical care was necessary, and that Mother contacted Father and he was unavailable, visitation would resume with Mother.

The magistrate court likewise limited Mother's participation in the children's schooling and extra-curricular activities. While Mother was allowed to observe extra-curricular activities and events, and speak to the children on such occasions, she was ordered not to "interfere" with them. The order specified that the children were to continue to complete the current school year at their current school; however, "[s]hould Father determine it would not be detrimental to the children," he was authorized to change their schools for the following year.

The magistrate court further ordered that the children were to receive counseling, with Father selecting an appropriate counselor. Ms. Moreno was ordered to remain as the parenting coordinator. The magistrate court also removed the "[2018 Custody Order]'s requirement that the parties complete an accurate medical history for the children[.]" Instead, it directed that "the [parenting coordinator] and Father come up with a medical history for the children based upon the information that they have at this point in time."

Mother was ordered to "begin appropriate counseling with a counselor other than Jason Beard for her dishonesty." Mother was to "find an appropriate counselor with experience in treating patients who have maladaptive characterological traits and pathological lying." The therapy was to continue until the therapist certified in writing that it was no longer needed. The order noted that "Mother may seek more visitation and legal authority over the boys if the approved counselor recommends that she has progressed sufficiently in her therapy to no longer pose a threat to the boys. If Mother continues to refuse to engage in appropriate therapy, Father shall continue to have sole legal and physical custody." The magistrate court also ordered Father to continue his counseling.

On October 8, 2024, Mother filed a motion requesting permission to appeal the 2024 Custody Order and the Partial Judgment to this Court pursuant to Idaho Appellate Rules 12.1 and 12.2. The magistrate court granted the motion, and Mother timely appealed.

## II. STANDARD OF REVIEW

"Modification of child custody may be ordered only when there has been a material, substantial and permanent change of circumstances indicating to the magistrate's satisfaction that a modification would be in the best interests of the child." *Woods v. Woods*, 163 Idaho 904, 906, 422 P.3d 1110, 1112 (2018). "[T]he determination of whether to modify child custody is left to the sound discretion of the trial court, and this Court will not attempt to substitute its judgment and discretion for that of the trial court except in cases where the record reflects a clear abuse of discretion." *Levin v. Levin*, 122 Idaho 583, 586, 836 P.2d 529, 532 (1992).

Under the abuse of discretion standard, this Court asks whether the trial court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018). An abuse of discretion occurs when the magistrate court's "findings are

clearly erroneous such that the court's findings are not based on substantial and competent evidence." *Schneider v. Schneider*, 151 Idaho 415, 420, 258 P.3d 350, 355 (2011). "Substantial evidence is more than a scintilla of proof, but less than a preponderance. It is relevant evidence that a reasonable mind might accept to support a conclusion." *Ehrlich v. DelRay Maughan, M.D., P.L.L.C.*, 165 Idaho 80, 83, 438 P.3d 777, 780 (2019) (citation omitted).

## III. ANALYSIS

### A. The magistrate court did not abuse its discretion by granting Father sole legal and physical custody of the children.

The primary issue on appeal is whether the magistrate court erred in modifying the 2018 Custody Order and granting Father sole legal and physical custody of the children. The magistrate court determined that there had been a material, substantial, and permanent change of circumstances since the imposition of the 2018 Custody Order, chiefly pointing to four things: (1) Mother's failure to comply with the 2018 Custody Order's directive to continue counseling; (2) Mother's failure to comply with the 2018 Custody Order's directive to obtain counseling from someone qualified to treat factitious disorder; (3) Mother's continuing dishonesty and misrepresentations; and (4) Mother's failure to comply with the 2018 Custody Order's directive to inform Father of medical and dental appointments. The magistrate court concluded that each failure to comply with the 2018 Custody Order negatively impacted the children, which it noted was "the paramount consideration in determining materiality of any particular change . . . ." The court also addressed each of the statutory factors for determining the best interests of the children, as set forth in Idaho Code section 32-717: the wishes of the parents; the wishes of the children; the relationship of the children with each other and their parents; the children's adjustment to their home, school, and community; the character of all individuals involved; and any domestic violence. I.C. § 32-717(1)(a)–(g). After determining that every factor either weighed in favor of Father or was neutral, the court concluded that it was in the best interests of the children that Father have sole legal and physical custody.

On appeal, Mother argues that the 2024 Custody Order represents a "major and drastic change in the arrangement" for the children and suggests that the evidence cited by the magistrate court in support of its decision was insufficient to justify such a significant modification in custody. Specifically, she argues that the magistrate court's determination that there had been a material, permanent, and substantial change in circumstances that negatively impacted the children was not supported by substantial and competent evidence. Mother further contends that the magistrate

court relied on evidence that was "contradicted" by other evidence at trial and was "largely biased and/or unreliable."

     *1. The magistrate court's factual findings were supported by substantial and competent evidence.*

Mother takes issue with various factual findings in the 2024 Custody Order, contending that they were not supported by substantial and competent evidence. Mother generally posits that the magistrate court gave too much weight to the evidence proffered by Father, while failing to give proper weight to the evidence she submitted. In this respect, Mother is merely asking this Court to second-guess the decision reached by the magistrate court. However, "appellate courts in Idaho do not reweigh evidence." *Neustadt v. Colafranceschi*, 167 Idaho 214, 227, 469 P.3d 1, 14 (2020) (internal quotation marks omitted) (quoting *Doe I v. Doe (2019-23)* (*In re Doe II*), 166 Idaho 47, 54, 454 P.3d 1130, 1137 (2019)). Instead, we will only substitute our "judgment and discretion for that of the trial court . . . in cases where the record reflects a clear abuse of discretion." *Levin v. Levin*, 122 Idaho 583, 586, 836 P.2d 529, 532 (1992).

First, Mother disputes the magistrate court's finding that she is dishonest. The main thrust of Mother's argument is that she has never been *formally diagnosed* with factitious disorder. She points out that her experts testified at trial that she did not meet the criteria for a diagnosis of factitious disorder. For example, Dr. York testified that Mother met only three of the four criteria to be formally diagnosed with factitious disorder. Mother argues that the magistrate court focused too heavily on her dishonesty, contending that the "constant allegations of lies and dishonesty" only served to elevate the conflict between the parties. She asserts that the magistrate court's findings regarding her dishonesty were not based on substantial and competent evidence, and were instead based on "conflicting evidence, speculation, conclusory statements, and inadmissible evidence."

An examination of the 2024 Custody Order extinguishes any concerns raised by Mother in this regard. The record reflects that the magistrate court recognized that the testimony was disputed regarding Mother's purported factitious disorder. Yet, the court made clear that it was not primarily concerned with Mother's formal diagnosis; rather, it was focused on her general "veracity and honesty." The record contains many examples demonstrating that Mother had continually been untruthful and concluded that such evidence established a clear pattern of dishonesty and misrepresentations.

Aside from making the sweeping assertion that the magistrate court's findings regarding her dishonesty were based on "conflicting evidence, speculation, conclusory statements, and inadmissible evidence," Mother does not identify which specific factual findings were improper, nor does she explain why they were not based on substantial and competent evidence. In fact, Mother makes no argument, other than conclusory statements, that the factual findings of the court were improper. As Father correctly points out, the record is replete with examples of Mother's dishonesty, constituting a "staggering" amount of evidence supporting the magistrate court's findings. The findings in the 2024 Custody Order detailed numerous instances of Mother's dishonesty, which constitute substantial and competent evidence supporting the court's findings. The magistrate court highlighted the following examples:

- Mother told the parenting coordinator that she could not reach the children when they were with Father; however, the evidence demonstrated that she was exchanging text messages with the boys at the time.

- Mother testified that she had signed and dated all "Releases for Information" necessary for the parenting coordinator to obtain medical and counseling records; however, the record demonstrated that Mother repeatedly objected to such requests and refused to sign.

- Mother upset the children by fabricating a story where she was purportedly contacted by a hospital in Washington regarding a foster child that Father and Mother had previously cared for; Mother alleged that the hospital asked her for consent to harvest the child's organs for an organ donation, and she purportedly granted such permission. The court found the story to be entirely uncredible.

- Mother's own expert, Dr. York, testified that Mother had a history of misrepresentations and exaggerations regarding her medical conditions, as well as the children's medical histories.

- Mother fabricated a story alleging that Father had failed to return equipment to Renter Center in Twin Falls; after the parenting coordinator fact-checked Mother's story, it turned out to be false.

- A parenting time evaluation, presented by Mother during the initial divorce proceedings, concluded that Mother had misrepresented her education credentials.

- Mother testified at trial that she had seen her counselor, Troy Bishop, over 50 times. However, Troy Bishop later testified that he had held only two meetings with Mother.[3]

- Mother took Younger Son to an unauthorized medical appointment at Frontier Pediatric in October 2019. The medical notes for that appointment contained an entry reporting that: "Mom states she is a little concerned about abuse . . . . Mom states that dad abused a 2 year old [sic] foster/adopted child and the child died." After Father challenged her for making this statement, Mother later denied saying it and attempted to "correct" the record years later. Additionally, the magistrate court found that Mother admitted that she had lied in a different case when testifying about this incident.

- In a contemporaneous personnel file from a former employer, fellow employees recounted Mother's unreliability, constant misrepresentations, and fabricated stories while at work. This included an incident where she purportedly had to "identify a former patient's body after a fire," along with falsehoods regarding "her father having emergency surgery, being in one location when she wasn't, about a care facility quarantining employees due to [COVID-19], among other stories."

- A report by the parenting coordinator detailed an incident where Mother fabricated a story that Younger Son was being treated for cancer and receiving blood transfusions. She later claimed that her child had never actually been in the hospital, and it was simply a "case study."

- Mother misrepresented a confrontation between her and Father at the county fair where Mother struck Father following an ongoing disagreement concerning Older Son's 4-H project and the time he was allotted to take care of his steer.

- Mother submitted a "doctored" MRI result to the parenting coordinator—purporting to show that she suffered from a brain tumor—when the actual MRI was normal.

- Numerous examples of misrepresentations Mother made in other medical records.

Beyond these examples, the magistrate court noted that two other magistrate judges, two parenting time evaluators, the current parenting coordinator, and Mother's own experts all determined that Mother was demonstrably dishonest. After reviewing the record, we conclude that

---

[3] Mother maintains that, due to a medical issue, Mr. Bishop testified that his memory was "shot" as to certain, specific details. However, while Bishop conceded in his trial testimony that he had memory issues, he testified that he was certain he did not provide counseling to Mother outside of the two meetings ("That, I can say without a doubt.").

the magistrate court's findings were supported by substantial and competent evidence in the record. Indeed, we note that the magistrate court made extremely detailed, thorough, and lengthy findings to support its conclusion that Mother displayed a pattern of dishonesty.

Looking beyond the magistrate court's determination that she was dishonest, Mother also contends that any alleged dishonesty did not negatively affect the children. In this regard, Mother disagrees with the magistrate court's analogizing of the present case to *Doe v. Doe*, 149 Idaho 669, 239 P.3d 774 (2010) ("*Doe 2010*"). In that case, the magistrate court granted the father sole legal and primary physical custody of the child because of mother's repeated dishonesty, which she used to justify denying father access to their child. *Id.* at 670, 239, P.3d at 775. This Court concluded that the mother's "three and one-half years of intransigence," including dishonesty, petty behavior, and her refusal to acknowledge or change her problematic behavior, warranted a modification of custody. *Id.* at 674–75, 239 P.3d at 779–80.

Mother argues that this case is distinguishable from *Doe 2010* since her dishonesty did not interfere with Father's access to the children. While Father may have been able to maintain regular visitation with the children despite Mother's troubling lies, the magistrate court found that Mother's pattern of problematic behavior, including dishonesty, was negatively affecting the children. Her actions, in particular instances and in general, negatively affected the children by causing turmoil and instability. The record also reflects a long history of Mother's intransigence in the face of court orders. In sum, not only was Mother dishonest, but she also repeatedly violated the 2018 Custody Order, made unsubstantiated claims against Father and the parenting coordinator and, when confronted, refused to accept responsibility for such conduct. The magistrate court concluded that, beyond Mother's dishonesty, she "create[d] constant chaos and instability," produced roadblocks for children's activities by "refus[ing] to . . . allow the boys to fully participate in the Twin Falls County Fair," and "destabilized the boys" through her refusal to cooperate with Father and follow the court's orders.

Mother contends that the present case is more like *Doe I (2016-7) v. Doe*, 161 Idaho 67, 383 P.3d 1237 (2016) ("*2016 Doe*"). In that case, this Court held that the magistrate court abused its discretion in granting a custody modification. *Id.* at 78, 383 P.3d at 1248. The magistrate court had determined that there was a substantial and material change in circumstances due to the mother's "alienating behavior." *Id.* at 70, 383 P.3d at 1240. However, after reviewing the record, this Court determined that it "simply cannot conclude, as a matter of law, that there was sufficient

15

evidence in the record to support a finding that [the mother] engaged in alienating behavior." *Id.* at 73–74, 383 P.3d at 1243–44. Thus, because there was insufficient evidence to support a material and substantial change in circumstances, the magistrate court had abused its discretion. *Id.* at 78, 383 P.3d at 1248.

Contrary to Mother's contention, this case presents an entirely different scenario than *2016 Doe*. The record in this case contains abundant evidence to support the magistrate court's findings. Simply put, there is substantial and competent evidence in the record to support the finding that Mother's actions resulted in a substantial and material change in circumstances. Here, it is the *impact* that the change in circumstances had on the children that is the chief concern—not the *magnitude* of the changes that is controlling. *See Woods v. Woods*, 163 Idaho 904, 907, 422 P.3d 1110, 1113 (2018) ("What may appear by itself to be a small and insignificant change in circumstances may have significant effects insofar as children are concerned.").

Importantly, we do not review this determination de novo; instead, we must determine whether there was a clear abuse of discretion. *See Levin*, 122 Idaho at 586, 836 P.2d at 532 ("[T]he determination of whether to modify child custody is left to the sound discretion of the trial court, and this Court will not attempt to substitute its judgment and discretion for that of the trial court except in cases where the record reflects a clear abuse of discretion."). Here, the trial court's long history with the parties, personal observations of their demeanor, and familiarity with the record are deserving of great deference, especially as to the credibility of the witnesses. After considering the extensive evidence in this case, the magistrate court determined that Mother's actions created a substantial, material, and permanent change in circumstances that "*absolutely impacted* the best interests of these children." (Emphasis added). We conclude that because this determination was supported by substantial and competent evidence, there was no abuse of discretion.

2. *We decline Mother's request to reweigh the evidence.*

Beyond arguing that the magistrate court's findings were not supported by sufficient evidence, Mother also attacks the weight the magistrate court afforded particular evidence and the credibility it assigned to certain testimony. She identifies multiple instances where the 2024 Custody Order emphasized evidence presented by Father, but did not do the same for evidence she presented.

According to Mother, the magistrate court placed inappropriate weight on the Frontier Pediatric record from 2019, set forth above. On appeal, Mother points out that she later made

efforts to correct her inaccurate statements to Frontier Pediatric; thus, the magistrate court placed too much weight on the incident as demonstrating her dishonesty. Similarly, Mother finds fault with the magistrate court's reliance on her failure to properly inform Father of medical appointments for the children, as required by the 2018 Custody Order. The 2024 Custody Order found that Mother continuously lied about medical appointments and failed to properly inform Father when they occurred. Mother contends that the court's reliance on this evidence is misplaced, because Father *also* failed to notify Mother of certain medical appointments on occasion. Likewise, Mother protests that the magistrate court placed too great of weight on "Troy Bishop's testimony," and on the arguments made by Father, his attorney, and Ms. Moreno. At the same time, she maintains that the magistrate court failed to give enough weight to Dr. York's testimony when it determined that Dr. York did not have "enough relevant and current information to come to any conclusion that should be given much weight by this [c]ourt."

We have consistently held that "appellate courts in Idaho do not reweigh evidence." *Neustadt*, 167 Idaho at 227, 469 P.3d at 14 (quoting *Doe I v. Doe (2019-23)* (*In re Doe II*), 166 Idaho 47, 54, 454 P.3d 1130, 1137 (2019)). Instead, this Court "defer[s] to the trial court's unique ability to 'accurately weigh the evidence and judge the demeanor of the witnesses' while taking into account the trial court's 'superior view of the entire situation.' " *Wilson v. Mocabee*, 167 Idaho 59, 68, 467 P.3d 423, 432 (2020) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 866, 421 P.3d 187, 197 (2018)); *see also Wilde v. Wilde*, 174 Idaho 451, 556 P.3d 830, 836 (2024) ("Appellate courts are not permitted to substitute their own view of the evidence for that of the trial court, or to make credibility determinations." (citation omitted)). Despite this clear principle of law, Mother is essentially requesting that we second-guess the magistrate court's view of that evidence and substitute our view of it. We decline to do so.

The magistrate court considered the evidence submitted during the eight-day trial and made extensive findings of fact in its 97-page order. In the 2024 Custody Order, the court set forth those findings, specifying which evidence it found to be most compelling and credible. Beyond alleging that the magistrate court placed too much weight on certain evidence, Mother makes no specific challenge to the court's evaluation of the evidence. For example, Mother contends that the court focused too heavily on the Frontier Pediatric Report, because she later attempted to fix her inaccurate statements, thereby mitigating any damage the report did to her credibility. The magistrate court considered the correction but reached a different conclusion because it found that

17

Mother's purported correction of the report was still inaccurate and "took entirely too long for the [c]ourt to find that it was anything other than an attempt to look better at trial."

Mother's other conclusory allegations that the magistrate court placed too much weight on certain arguments made by Father, his attorney, and the parenting coordinator, while not placing enough weight on her arguments or her own experts, are not sufficient to demonstrate an abuse of discretion. Despite initially acknowledging the standard of review that this Court applies to custody modifications on appeal, Mother loses sight of the standard throughout her briefing. For example, Mother indicates in her reply brief that Father has failed to meet his burden of proof on appeal. Yet, while Father bore the burden at trial, it is Mother who on appeal must demonstrate that the magistrate court abused its discretion in modifying custody. *See Ellis v. Ellis*, 167 Idaho 1, 7, 467 P.3d 365, 371 (2020) ("The appellant carries the burden of showing that the trial court committed error."). Although Mother may disagree with the magistrate court's findings and its ultimate decision, mere disagreement alone is not enough. Therefore, we again decline the invitation to reweigh the evidence. As noted above, the magistrate court was in the best position to weigh the conflicting testimonies and assess credibility. After doing so, the court issued a lengthy and thorough decision outlining the reasons for its conclusions by pointing to substantial and competent evidence in the record. Therefore, we once again conclude that Mother has failed to demonstrate that the magistrate court abused its discretion in this case.

3. *The magistrate court did not err by ordering Mother to obtain counseling, nor by considering her lack of compliance with the 2018 Custody Order.*

Mother next argues that the magistrate court erred by ordering her to obtain counseling for her dishonesty. The issues of Mother's dishonesty and possible factitious disorder have been a primary focus throughout the entirety of these proceedings, stemming back to the original custody trial in 2018. The 2018 Custody Order found by a preponderance of the evidence that Mother suffered from factitious disorder and directed Mother to undergo counseling related to her dishonesty with someone trained in treating factitious disorder. In the 2024 Custody Order, the magistrate court did not attribute any specific diagnosis to Mother's behavior, but still determined that Mother's failure to comply with the 2018 Custody Order's directive to obtain counseling for her dishonesty contributed to the material and substantial change in circumstances warranting a custody modification.

On appeal, Mother argues that such a determination was erroneous because the counseling requirement in the 2018 Custody Order was improper in the first instance. In support of this

18

proposition, Mother points to this Court's ruling in *Kelly v. Kelly*, where we held that "a judge has no authority to order medical/psychological treatment in a custody case *unless* there is direct testimony that such treatment would be in the *best interest* of the child." 165 Idaho 716, 731, 451 P.3d 429, 444 (2019). Mother argues that the 2018 Custody Order was "deficient" because it did not tie the counseling requirement to a finding that the treatment would be in the best interests of the children. Further, because the 2024 Custody Order relied on Mother's noncompliance with the "deficient" 2018 Custody Order in justifying the custody modification, Mother contends that the 2024 Custody Order is likewise deficient.

Mother's argument is unavailing. Initially, we note that the 2018 Custody Order was never appealed by Mother and is not before this Court now; rather, it is the 2024 Custody Order that has been appealed. As a result, we decline to address any collateral attack on the 2018 Custody Order. However, insofar as the 2024 Custody Order is alleged to be inadequate because it considered Mother's lack of compliance with the 2018 Custody Order, we disagree. We made clear in *Kelly* that, "[i]f the record supports such a conclusion [that treatment would be in the best interest of the child], the trial court may appropriately order such treatment as a condition of visitation." *Id.* While the 2018 Custody Order did not make a specific finding that such treatment was for the benefit of the children, it can be inferred from the record; the court clearly did not order Mother to receive counseling solely for her own benefit. As the magistrate court confirmed in the 2024 Custody Order: "In this case, the 2018 Custody Order for psychological treatment is clearly grounded in what is in the best interests of the children. Mother's continuous lies are detrimental to the children. The therapy was ordered to deal with that issue." Importantly, the 2018 Custody Order was issued before this Court's decision in *Kelly*. Thus, Mother failed to demonstrate that the 2024 Custody Order is deficient, insofar as it relied on her failure to comply with the counseling requirement in the 2018 Custody Order.

We also note that the 2024 Custody Order determined that material and substantial changes in circumstances had occurred for *many reasons*, only one of which was Mother's noncompliance with the 2018 Custody Order's directive to obtain counseling. The other reasons, noted above, had nothing to do with the 2018 Custody Order's directive for Mother to obtain counseling. Put simply, it was not improper for the 2024 Custody Order to consider Mother's lack of compliance with the 2018 Custody Order when determining if a material, substantial, and permanent change in

19

circumstances had occurred. Summarizing this Court's holding in *Pottenger v. Charlton*, 172 Idaho 154, 161–62, 530 P.3d 701, 708–09 (2023), the magistrate court correctly noted:

> A court may consider whether failure to comply with a provision in the custody order is a substantial and material change in circumstances. This consideration is still appropriate regardless of whether the other party has brought an enforcement action. If the failure to comply with a provision is substantial and material that impacts the children, modification may be appropriate.

We conclude that the magistrate court did not abuse its discretion in determining that Mother's failure to attend counseling as ordered by the 2018 Custody Order was one of the material and substantial changes in circumstances that supported its decision to modify the original custody arrangement.

Beyond alleging that the magistrate court could not properly consider her noncompliance with the 2018 Custody Order's directive to obtain counseling, Mother also disputes the underlying finding that she did not comply with the counseling directive. She points out that, starting in 2022, she did begin counseling with Jason Beard. However, Mother glosses over the fact that her counseling did not commence until *four years after* the 2018 Custody Order directed her to continue counseling with Troy Bishop. Mother offers no explanation for her delay in obtaining counseling between 2018 and 2022.[4] Thus, there is no merit to her assertion that the court erred in its determination that she failed to obtain counseling in compliance with the 2018 Custody Order.

Once again, we note that the magistrate court considered a massive amount of evidence, considered arguments from both parties, and rendered a thorough, 97-page memorandum explaining its decision. The magistrate court made detailed and specific findings of fact based on its uniquely "superior view of the entire situation." *Lunneborg*, 163 Idaho at 866–67, 421 P.3d at 197 (citation omitted); *see Wilson v. Wilson*, 174 Idaho at ___, 560 P.3d 1126, 1137 (2024) (upholding a custody order and emphasizing the "thorough" decision consisting of "more than fifteen pages of factual findings and an additional ten pages of thorough discussion of each factor under section 32-717 regarding the best interests of the child"). We conclude that there was substantial and competent evidence to support the 2024 Custody Order and that the magistrate court did not abuse its discretion in granting Father legal and physical custody of the children.

---

[4] Mr. Bishop retired in 2021, leading the parenting coordinator to help Mother to find a new counselor in Mr. Beard. Mother's failure to attend counseling with Mr. Bishop long predated his retirement, a fact that Mother does not dispute.

**B. The magistrate court did not abuse its discretion in denying Mother's motion for the court to interview the children.**

Mother next contends that the magistrate court erred by denying her motion for the court to personally interview the children pursuant to Idaho Rule of Family Law Procedure 118.[5] That rule states that a court may, in its discretion, interview a minor child who is the subject of a custody dispute "to ascertain any relevant information, including the child's wishes." I.R.F.L.P. 118. Such an interview may be conducted on the court's own motion or by motion of any party; the parties may also stipulate that the record of the interview not be provided to the parties, may be conducted off record, or if recorded, that it may be sealed in whole or in part. *Id.*

In this case, Mother filed a motion requesting that the magistrate court interview the children prior to the trial on the custody modification in order to ascertain their wishes "as to custody, parenting time, and school choice." Mother also requested that the court appoint an attorney to represent the children in relation to the interview. She noted that the children were ages 13 and 10 at the time and asserted that they possessed "sufficient maturity to direct an attorney." The magistrate court did not act on this motion before trial. When the trial concluded, Mother renewed her request for the court to interview the children, noting that there had been "extensive testimony at trial regarding a host of statements [the children] allegedly made, most of which appear conflicting or disputed." The magistrate court ultimately declined to interview the children.

Addressing the matter in the 2024 Custody Order, the court noted that it did "not doubt that the boys love both of their parents." However, it was "clear from the record that the boys have learned to tell both parents what they want to hear at times." The magistrate court explained that it denied the request to interview the children because they had "been through enough." The court also noted that the boys were not currently in counseling and that they "are aware that Mother has been accused of being dishonest. It is unclear that they fully understand the extent of that dishonesty or how detrimental it can be to their well-being."

Although Mother acknowledges that the court's decision to interview the children was a matter of discretion, she maintains that its decision was erroneous. However, rather than alleging any specific abuse of discretion by the magistrate court, Mother merely asserts that the decision was "astonishing" considering the children's age and the circumstances of the dispute. Mother

---

[5] The Idaho Rules of Family Law Procedure were recently amended. The provision regarding court interviews of minor children is now found in Idaho Rule of Family Law Procedure 117. However, this proceeding occurred before such change; thus, the previous version of the rule is applicable here.

21

suggests that, had the court interviewed the children, "the parties could have stipulated to have the recordings of the interviews sealed" to prevent any concerns about the parents learning the contents of such an interview. Mother also notes that "having a direct discussion with the Boys would have provided some clarity to the court on a significant factor (the wishes of the children) that the court must consider when making a child custody determination." For these reasons, Mother simply surmises that it "was not a reasonable determination considering the circumstances nor was it supported by substantial and competent evidence."

Mother falls short of demonstrating that the magistrate court abused its discretion in denying the motion to interview the children. Again, instead of alleging a specific violation of one of the four *Lunneborg* factors that constitute the abuse of discretion standard, Mother merely quarrels with the wisdom of the magistrate court's discretionary choice. This is not enough to establish an abuse of discretion. Even if we read Mother's argument as implicating the fourth factor—that the magistrate court did not reach its decision through the exercise of reason—she fails to proffer any discernable rationale supporting that argument. Here, the magistrate court concluded that the potential harm to the children exceeded the potential benefit of the interview. It gave its reason for that decision: the two boys had "been through enough." The magistrate court also noted that the children were not currently in counseling, further supporting its decision not to interview the children, as they were already dealing with a difficult situation but without an outlet to process it. Moreover, the magistrate court had other evidence regarding the children's wishes by way of the extensive evidence presented by both parties at trial, much of which focused directly on the children's well-being. This included evidence about how the boys interacted with each other and their parents, their interests, their struggles, and more.

A generalized complaint that the court, in Mother's opinion, *should* have done something different, is not enough to demonstrate the magistrate court abused its discretion. As a result, we conclude that Mother failed to establish that the magistrate court abused its discretion in denying the motion to interview the children.

C. **The magistrate court did not err in admitting Mother's personnel file from her prior employer.**

Mother next contends that, at trial, the magistrate court erroneously admitted her personnel file from one of her previous employers, Idaho Home Health and Hospice, where she worked as a nurse from 2017 until she was terminated in 2021. She argues that the file was not relevant to the modification proceeding. We disagree.

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." I.R.E. 401. "Whether a fact is 'of consequence' or material is determined by its relationship to the legal theories presented by the parties." *State v. Garcia*, 166 Idaho 661, 670, 462 P.3d 1125, 1134 (2020) (citation omitted). Relevant evidence can be excluded by the trial court under Idaho Rule of Evidence 403 if "the probative value of the evidence is substantially outweighed by its prejudicial nature." *State v. Raudebaugh*, 124 Idaho 758, 765, 864 P.2d 596, 603 (1993); *see* I.R.E. 403. Whether evidence is relevant is reviewed de novo; however, the decision to admit or exclude evidence under another rule is generally reviewed for an abuse of discretion. *Martinez v. Carretero*, 173 Idaho 87, 97, 539 P.3d 565, 575 (2023).

Father obtained the personnel file via a subpoena duces tecum and the court admitted it under seal over a relevance objection by Mother. The file revealed "several things that lead up to Mother's termination from her employment," one of which being her pattern of dishonesty. Because "[t]he primary issue in this action [was] whether Mother ha[d] stopped with her dishonesty and manipulation of information," the magistrate court determined that the file was relevant, as it "reflect[ed] Mother's continued dishonesty[.]" The court specifically identified several incidents of Mother's dishonesty that were detailed in the personnel file. For example, there was an anonymous complaint that stated Mother was "crafty with her wording and manipulation and therefore finds ways to talk herself out of what is actually going on." Other employees told the company that "[s]he's a pathological liar, lies about everything." (Alteration in original.) The file also identified "concerning" stories Mother had told to various people that conflicted with internal records, including a story that she had been asked to attend to, and identify, a "charred body" of a patient after a purported fire.

On appeal, Mother asserts that the file was not relevant to the proceeding and should have been excluded at trial. However, Mother fails to cogently argue why the file was irrelevant to the proceeding. In fact, Mother dedicates one single line of argument to the matter: "Simply put, [Mother]'s personnel file from a former employer has nothing to do with the Boys or what is or is not in their best interest." This conclusory statement alone is not sufficient to raise the issue on appeal.

"It is well established that this Court will not consider an issue on appeal that is not 'supported by argument and authority in the opening brief.'" *Greenfield v. Meyer*, 174 Idaho 774,

560 P.3d 517, 525 (2024) (quoting *Jorgensen v. Coppedge*, 145 Idaho 524, 528, 181 P.3d 450, 454 (2008)). "Where an appellant fails to assert [her] assignments of error with particularity and to support [her] position with sufficient authority, those assignments of error are too indefinite to be heard by the Court." *Bach* v. *Bagley*, 148 Idaho 784, 790, 229 P.3d 1146, 1152 (2010) (citing *Randall* v. *Ganz*, 96 Idaho 785, 788, 537 P.2d 65, 68 (1975)). Mother does not identify the relevant standard, nor does she provide any argument or explanation as to why the file was not relevant. As a result, Mother has waived this issue on appeal.

Even if Mother's argument was not waived, the personnel file was relevant. The issue at the heart of a child custody trial is the best interests of the children, and an important statutory factor for determining the best interests of the children is the *character* of the parties. I.C. § 32-717(1)(e). The magistrate court recognized this fact, stating that the personnel file was relevant to the case at hand because it shed light on Mother's dishonesty. Even more specifically, the file showed that her dishonesty was not simply limited to lying about the children's medical history, or her own; instead, her dishonesty spilled over into other aspects of her life. Thus, while the exact circumstances of her workplace dishonesty may not have been important, Mother's reputation for dishonesty was relevant to the proceeding. As in most hotly contested custody disputes, the character of both parents was directly at issue in the custody trial. *See id*. Here, Mother's reputation for dishonesty also reflected on her credibility. *See* I.R.E. 608.

Alternatively, Mother alleges that the magistrate court should have excluded the personnel file because "its probative value [was] substantially outweighed by its prejudicial effect." While this argument invokes Idaho Rule of Evidence 403, it is important to note that this rule only applies when the contested evidence would lead to "*unfair* prejudice." I.R.E. 403 (emphasis added). Mother again provides scant argument or reasoning to support her assertion. She posits that it "becomes clear" that the file's probative value is substantially outweighed by its prejudicial effect when looking at the weight the magistrate court ultimately put on the file in concluding that Mother was dishonest. Mother also takes issue with the magistrate court's finding that Mother's "reasons" for her dishonesty are "not relevant when the dishonesty harms the children in this case." Based on this statement alone, Mother concludes that the file "never should have been admitted nor should it have ever been given the weight that it was."

First, we note that Mother failed to object to the personnel file based on Idaho Rule of Evidence 403 at trial. "It is a fundamental tenet of appellate law that a proper and timely objection

must be made in the trial court before an issue is preserved for appeal." *State v. Carlson*, 134 Idaho 389, 398, 3 P.3d 67, 76 (Ct. App. 2000). If an objection is not raised below, it may not be considered for the first time on appeal. *State v. Johnson*, 126 Idaho 892, 896, 894 P.2d 125, 129 (1995); *see also* I.R.E. 103(a)(1). Thus, Mother has failed to preserve this objection. Moreover, Mother fails to support her argument on appeal with authority or cogent reasoning. While Mother cites to Idaho Rule of Evidence 403, she offers no explanation or reasoning in support of her argument, and she fails to identify what prong, if any, of the abuse of discretion standard that the magistrate court purportedly violated. She also failed to specify what unfair prejudice she suffered because of the file's admission.

Even if we were to address Mother's argument, we would have to conclude that the magistrate court did not abuse its discretion in admitting the personnel file. The evidence here had high probative value: it documented a recorded pattern of dishonesty. As stated by the magistrate court, Mother's dishonesty was at the center of the trial. The mere fact that evidence depicts a person poorly does not render it "unfairly prejudicial" under Rule 403. While being referred to as a "pathological liar" may have a prejudicial effect, Mother's tendency to continually fabricate stories was extremely relevant to, and probative of, Mother's ability to parent the children in a manner consistent with their best interests. Mother has not demonstrated that the evidence, which was highly probative of her character, is substantially outweighed by its prejudicial effect.

## D. The magistrate court did not err in denying Mother's request to remove the parenting coordinator.

Mother next argues that the magistrate court's failure to remove the parenting coordinator was an abuse of discretion. For the reasons explained below, we disagree.

Ms. Moreno was appointed as the parenting coordinator in February 2019, by agreement of the parties. The order appointing Ms. Moreno authorized her to "assist the parties with reaching an agreement on any issue regarding legal and physical custody of their children" consistent with applicable law. It also authorized her to make official decisions on certain issues, consistent with the 2018 Custody Order, including: "Resolving day-to-day issues that arise regarding physical and legal custody" of the children; minor alterations to the custody schedule; scheduling "make up" time; selecting which parent may enroll the children in school; the "manner and methods by which the parties may communicate with each other"; determining which parent "may authorize counseling or health care treatment" for the children; and other similar issues. The parenting coordinator was directed to "be impartial and to advise all parties of any circumstances bearing on

possible bias, prejudice, or impartiality." However, the 2018 Custody Order made clear that "rendering a decision in and of itself does not constitute bias."

Mother twice filed petitions to remove or replace Ms. Moreno as the parenting coordinator. Mother filed the first petition in November 2020, alleging that Ms. Moreno had developed a personal bias against her and had not been available at necessary times to assist her. Mother argued that Ms. Moreno was increasing the conflict between the parties, rather than alleviating it, which was not in the best interests of the children. Mother requested that the court remove the parenting coordinator altogether or, in the alternative, replace Ms. Moreno with a different coordinator.

Following a hearing, the magistrate court denied the 2020 petition, concluding that a parenting coordinator remained necessary as the parents had benefitted greatly from the appointment of a parenting coordinator. Moreover, the court noted that both custodial evaluations recommended that a parenting coordinator be appointed, and that the parenting coordinator had significantly helped resolve the constant disagreements between the parents. Additionally, the magistrate court addressed each situation that Mother alleged demonstrated bias and determined that each allegation was unsubstantiated or simply the result of Ms. Moreno doing her job as specified by the 2018 Custody Order. For example, the court found that Ms. Moreno's frustration with Mother's repeated and continuous noncompliance with the 2018 Custody Order did not signify personal bias and did not establish that Ms. Moreno could not continue as an effective coordinator. Finally, while Ms. Moreno had fallen behind on filing certain status reports, the court determined that it was not an issue warranting her removal—especially considering her strong relationship with the children and the rapport she was building.

In July 2022, Mother filed the second motion to remove Ms. Moreno as the parenting coordinator. She again alleged that Ms. Moreno was biased against her and was working closely with Father for the purposes of "setting the stage" for a modification in the custody case. She also alleged that Ms. Moreno failed to address her concerns that Father was allowing Older Son to drive farm equipment unsupervised. The magistrate court again denied the motion, concluding that Mother's claims of bias were unsubstantiated. The court noted that Mother's petition largely mirrored her first petition to remove Ms. Moreno, and that her claims continued to be unconvincing. The court determined that Mother's petition, which was "filled with assertions that the [parenting coordinator] is operating outside the scope of her authority" were "patently false." Moreover, Mother's claims of bias were again unsupported. The court concluded that the parenting

coordinator's actions in "[r]uling against Mother, refusing to engage in Mother's constant requests on the same issue, consistently requesting that Mother respond to questions she has refused to respond to, and attempting to hold Mother accountable *are not a show of bias*." (Emphasis added).

Mother once more requested that Ms. Moreno be removed as the parenting coordinator in her answer and counterclaim to Father's present petition for custody modification. Mother again claimed that Ms. Moreno was exceeding her authority as a parenting coordinator and was biased against her. In the 2024 Custody Order, the magistrate court determined that Ms. Moreno would remain as the parenting coordinator.

On appeal, Mother asserts that the magistrate court abused its discretion in failing to remove Ms. Moreno as the parenting coordinator. Mother points to three things as requiring Ms. Moreno's removal: (1) her alleged impartiality; (2) the fact that she directed the parties to discontinue the children's counseling; and (3) her failure to timely file status reports in compliance with the 2018 Custody Order. We will address each ground for removal in turn.

Mother's claim that Ms. Moreno is biased against her is not explicitly set forth in her briefing. Mother provides a lengthy recounting of the various factual scenarios that made up her two prior requests to remove Ms. Moreno as the parenting coordinator. However, beyond merely recounting the facts the magistrate court considered when it rejected her previous petitions for removal, Mother fails to provide any substantive argument demonstrating Ms. Moreno's alleged partiality in this matter. Indeed, Mother's argument on this issue consists of a lengthy summary of facts, followed by a brief legal conclusion that "the record shows that [Ms. Moreno has] repeatedly exceeded her authority and violated her obligations of impartiality." Because Mother fails to connect the facts to her argument, we are left in the dark as to which decisions demonstrate bias, which actions amount to improper conduct, or what error the magistrate court committed.

To the extent that Mother argues that Ms. Moreno is biased against her for the same reasons as alleged in her prior two petitions for removal, we conclude that there has been no showing of bias. Contrary to Mother's assertion, all the record establishes is that Ms. Moreno made a number of decisions that Mother did not like. This alone does not demonstrate bias, let alone an abuse of discretion by the magistrate court in failing to remove Ms. Moreno as parenting coordinator. On multiple occasions, the magistrate court squarely addressed the issue of bias, explaining why adverse decisions to Mother did not mean that Ms. Moreno was biased against her. The magistrate court found that Ms. Moreno was acting within her authority and in a manner conducive to the

best interests of the children. We conclude that the evidence supports the magistrate court's findings, and that Mother has failed to identify an abuse of discretion in this regard.

Mother next contends that Ms. Moreno acted improperly when directing the children to stop counseling with Melissa Osen, and that such action warranted her removal as parenting coordinator. The 2018 Custody Order directed the children to continue attending therapy with Ms. Osen, whom they were seeing leading up to the custody trial. The 2018 Custody Order also made clear that "neither party shall communicate or discuss any matters with Ms. Osen unless requested by her to do so." The children continued to see Ms. Osen after the 2018 Custody Order was entered. At some point, Ms. Moreno became concerned that Ms. Osen was developing a bias in favor of Mother, and against Father. This was evidenced by Ms. Osen speaking very frequently with Mother about the children, but rarely ever speaking with Father. Ms. Moreno also requested information and files on the children from Ms. Osen but received no response. In February 2020, Ms. Moreno filed a report and decision regarding the children's continued counseling with Ms. Osen, detailing the concerns listed above. Ms. Moreno noted that Ms. Osen's conduct was "highly inappropriate and unethical in any split-family situation, let alone a high conflict situation." In light of these concerns, Ms. Moreno issued a subsequent decision requiring the children to attend counseling with a different counselor as soon as an opening became available.

On appeal, Mother argues that Ms. Moreno's decision directing the children to discontinue counseling with Ms. Osen "created more tension, more conflict, and more issues between the parties, which is in direct contradiction to what the purpose and goals of a parenting coordinator are." However, beyond making this allegation, Mother fails to point to any specific facts in the record that support her claim. Moreover, Mother fails to articulate how Ms. Moreno's actions were improper in the first place, let alone how the magistrate court abused its discretion in retaining her as the parenting coordinator. The record supports the magistrate court's finding that Ms. Moreno had good reason to direct the children to attend counseling with someone other than Ms. Osen. The magistrate court found that Ms. Osen had failed to timely provide files and information about the children to Ms. Moreno, who was permissibly inquiring about the children's wellbeing. Further, the magistrate court determined that Ms. Moreno's concerns about Ms. Osen's bias towards Mother were warranted by Ms. Osen's behavior. The magistrate court specifically found that Mother and Ms. Osen had repeated contact in a manner that was prohibited by the 2018 Custody Order. The court stated that it was "very concerned that Mother continually contacted Ms.

Osen and not only did Ms. Osen not inform Mother that the behavior needed to stop, she would, at times, inquire of the children about information she received from Mother." Ms. Moreno made clear that her decision to terminate counseling with Ms. Osen was in the best interests of the children, and the magistrate court agreed.

Finally, Mother argues that Ms. Moreno's failure to consistently file status reports on time warranted her removal (the same claim made in her first petition for removal of Ms. Moreno). However, Mother fails to cogently argue that such a failure by Ms. Moreno warranted her removal. In her brief, Mother simply notes the dates that status reports were filed and states that Ms. Moreno "did not even comply with her statutory and court ordered duty to file a status report within the first sixty (60) days of being appointed and six months thereafter." While true that Ms. Moreno did not file a status report every six months, Mother stops short of explaining why this warrants her removal. The magistrate court determined that Ms. Moreno served "a significant role in making sure the boys' best interests are being served and reporting those concerns to the [c]ourt." Although filing timely status reports is, of course, beneficial and expected of a parenting coordinator, failure to do so is not an automatic basis for her removal. *See, e.g.*, I.R.F.L.P. 1002. The magistrate court concluded that, as the parenting coordinator, Ms. Moreno was acting in the best interests of the children. On appeal, Mother fails to show any error in this conclusion.

While Mother asserts that the facts speak for themselves, substantial and competent evidence in the record demonstrates that the magistrate court properly determined that Ms. Moreno was acting properly and effectively in her role as the parenting coordinator. Mother has shown no partiality or bias by Ms. Moreno against Mother that would warrant her removal. A review of the overall record demonstrates that Ms. Moreno has done a commendable job in a challenging situation. Therefore, we conclude that the magistrate court did not abuse its discretion in making that decision.

**E. The magistrate court did not err in ordering Mother to obtain a new counselor for addressing her dishonesty.**

The 2024 Custody Order required Mother to begin counseling for her dishonesty, and to "find an appropriate counselor with experience in treating patients who have maladaptive characterological traits and pathological lying." Additionally, the "counselor's experience must extend to treating a parent, in a co-parenting situation, as to the damage that dishonesty can cause to the children." The magistrate court found that Jason Beard, Mother's existing counselor, did not meet this criterion.

Mother alleges that the magistrate court erred in ordering her to attend counseling for her dishonesty with someone other than Mr. Beard. Mother again relies on *Kelly v. Kelly*, where this Court held that "a judge has no authority to order medical/psychological treatment in a custody case *unless* there is direct testimony that such treatment would be in the *best interest* of the child." 165 Idaho at 731, 451 P.3d at 444. However, "[i]f the record supports such a conclusion, the trial court may appropriately order such treatment as a condition of visitation." *Id.* Mother contends that, because there was not substantial and competent evidence to support the court's finding that her dishonesty was negatively impacting the children, it was improper for the court to order her to attend counseling.

As we have already held, there is substantial and competent evidence to support the court's findings that Mother is dishonest. Moreover, the magistrate court expressly found that Mother's dishonesty was negatively impacting her children. The 2024 Custody Order stated:

> Mother has a pattern of being dishonest. These are not "allegations". Despite Mother's claims to the contrary, she is dishonest in numerous aspects of her, and the boys' lives. She did not even attempt to start therapy with Jason Beard until 2022. She was ordered to therapy in 2018. This failure has led to Mother continuing to be dishonest, *which is absolutely having a detrimental effect on the children*.

(Emphasis added). The 2024 Custody Order explicitly addressed this Court's holding in *Kelly*, making it clear that Mother's counseling was for the benefit of the children. The magistrate court restated its finding that Mother's "continuous lies are detrimental to the children," and even gave specific examples of when Mother's dishonesty negatively impacted the children. To repeat just a few, Mother's lies surrounding the "dead foster child" led the children to fight over which child was appropriately grieving the loss of the foster child whom they have never met. Testimony indicated that this was one of the most serious fights between the boys, and it was caused by Mother's lies. Mother's lie that Father had abused and killed a different foster child also negatively impacted the boys, as they had to hear false stories about their father abusing a child and potentially causing the child's death. Finally, the record demonstrates that two parenting time coordinators recommended Mother obtain treatment for her dishonesty because Mother's behavior was negatively impacting the children. We conclude that the magistrate court did not abuse its discretion in ordering Mother to obtain counseling for her dishonesty.

Mother asserts that, because Mr. Beard testified that he believed he was qualified to treat Mother's dishonesty, it was an abuse of discretion for the court to determine otherwise. However, the magistrate court's reasons for ordering Mother to attend counseling with someone other than

Mr. Beard were well-reasoned. The court found that, despite there being "clear evidence of Mother's propensity to be dishonest[,]" Mr. Beard opted not to "work with her on that issue," and instead took "the position that Mother is somehow a victim of accusations." The magistrate court noted that it was "difficult to understand from the testimony *how exactly Mr. Beard could be treating Mother for her tendencies to be dishonest when it does not appear that he believes she is dishonest*. In fact, he admitted that he has no reason to believe Mother is not credible." (Emphasis added). Moreover, Mr. Beard admitted he made no effort to determine whether Mother was being dishonest and had no prior experience treating factitious disorder as required by the 2018 Custody Order.

The magistrate court provided a thorough and lucid explanation for its determination, and Mother has failed to demonstrate how it abused its discretion by ordering her to attend counseling with someone other than Mr. Beard. Therefore, we conclude that the magistrate court did not abuse its discretion by ordering Mother to attend counseling with a different counselor.

**F. The magistrate court did not err in granting Father's motion to strike.**

Mother next contends that the magistrate court erred in granting Father's motion to strike her response to his closing argument. At the conclusion of the trial, the magistrate court directed both parties to simultaneously file written closing arguments with the court, and indicated that rebuttals to the closing statements would not be necessary. After both parties filed their respective closing arguments, Mother filed an additional response with the court, specifically rebutting Father's closing argument. Two days later, Father filed a motion to strike Mother's rebuttal. The magistrate court granted the motion, noting that it had ordered simultaneous filing of the closing arguments and that neither party was entitled to file a rebuttal to such arguments.

On appeal, Mother argues that the magistrate court abused its discretion in granting Father's motion to strike her rebuttal argument. However, Mother fails to identify the relevant standard of review and does not support her argument with legal authority. Instead, Mother simply states that the extensive record in this case, coupled with the "unsupported and inflammatory conclusion contained in" Father's closing argument, warranted a denial of Father's motion to strike. Mother makes no effort to show why she was entitled to file a rebuttal, nor does she provide any explanation as to how the magistrate court abused its discretion.

Again, we will not consider an issue on appeal that is unsupported by argument and authority. *Greenfield*, 174 Idaho at ___, 560 P.3d at 525. "Where an appellant fails to assert his

assignments of error with particularity and to support his position with sufficient authority, those assignments of error are too indefinite to be heard by the Court." *Bach*, 148 Idaho at 790, 229 P.3d at 1152 (citing *Randall*, 96 Idaho at 788, 537 P.2d at 68). Here, because Mother fails to identify the relevant standard of review, does not support her argument with any legal authority, and offers no substantive argument on the matter, we conclude that she has waived the issue on appeal.

Even if we were to address the issue, we note that a trial court has "the authority to enforce its order." *Browning v. Browning*, 136 Idaho 691, 696, 39 P.3d 631, 636 (2001). Here, when making a discretionary decision about the briefing schedule, the magistrate court ordered simultaneous briefing for closing arguments and indicated that no rebuttals would be allowed because it "didn't think rebuttals were necessary in this case." Because briefing was simultaneous, neither party was disadvantaged by the lack of rebuttal. Moreover, if any party had the right to complain about the inability to file a rebuttal, it would have been Father, as he was the petitioner in this instance and would ordinarily be entitled to the last word.

## G. Father is entitled to attorney fees and costs on appeal.

Both parties request attorney fees on appeal under Idaho Code section 12-121. "Attorney fees under this statute may be awarded to the prevailing party when an appeal is brought frivolously, unreasonably, or without foundation." *Kelly*, 165 Idaho at 732, 451 P.3d at 445 (citing I.C. § 12-121). "Under [Idaho Code section] 12-121, a party is entitled to attorney[] fees if the appeal merely invites the appellate court to second guess the trial court on the weight of evidence." *Crowley v. Critchfield*, 145 Idaho 509, 514, 181 P.3d 435, 440 (2007) (citing *Anderson v. Larsen*, 136 Idaho 402, 408, 34 P.3d 1085, 1091 (2001)). "An appeal may be deemed frivolous, and attorney fees awarded, for failure to properly comply with [Idaho Appellate Rule] 35(a)(6)." *Woods v. Sanders*, 150 Idaho 53, 61, 244 P.3d 197, 205 (2010) (citing *Sprinkler Irrigation Co. v. John Deere Ins. Co.*, 139 Idaho 691, 698, 85 P.3d 667, 674 (2004)). "[W]hen a party fail[s] to present a genuine allegation of factual or legal error on the part of the magistrate judge, an award of attorney fees under [section] 12-121 is appropriate." *Id.* (all but first alteration in original) (internal quotation marks omitted).

Father prevailed on every issue and is clearly the prevailing party. Our review of the record also convinces us that Mother brought this appeal frivolously, unreasonably, and without foundation. As Father points out, Mother improperly asks this Court to "second-guess the trial court" and reweigh the evidence. In certain portions of her briefing, Mother makes this request

explicit, solely taking issue with the weight the magistrate court put on certain evidence. A prime example is Mother's complaint that there was not substantial and competent evidence to support the magistrate court's findings because the evidence was "contradicted" by other evidence at trial. Mother makes this complaint despite this Court's clear direction that substantial evidence may exist even if there is conflicting evidence, and that "[s]ubstantial evidence does not require that the evidence be uncontradicted." *Kelly*, 165 Idaho at 730, 451 P.3d at 443. Moreover, Mother repeatedly failed to support her arguments on appeal with cogent argument or citations to authority, resulting in the waiver of multiple issues on appeal. While Mother provides an in-depth history recounting her version of the facts underlying this case, she repeatedly stops short of applying any legal reasoning to those facts.

This case is analogous to our recent decision in *Wilson v. Wilson*, where we awarded attorney fees on appeal of a custody modification order. 174 Idaho 979, ___, 560 P.3d 1126, 1140 (2024). There, the appeal was "essentially a request for this Court to reweigh the evidence, second guess the magistrate court's credibility determination, and reach a different conclusion than the magistrate court on custody matters within its discretion." *Id.* The magistrate court "issued an extensive written memorandum, consisting of over fifteen pages of factual findings and ten pages of analysis" on the relevant issues, including "each enumerated factor under Idaho Code section 32-717." *Id.* As a result, this Court determined that the appeal warranted an award of attorney fees under section 12-121. *Id.*

Here, the magistrate court issued an even more extensive written memorandum, consisting of 71 pages of fact finding and 24 pages of legal analysis; it addressed each relevant issue in depth, surveying each enumerated factor under Idaho Code section 32-717, and reached a reasoned result consistent with the applicable laws. Mother's appeal simply asks this Court to reweigh the evidence and second-guess the magistrate court, with the hope that we will reach a different conclusion. Further, Mother repeatedly failed to cite relevant authority and provide cogent arguments supporting her appeal. *See Millard v. Talburt*, 173 Idaho 533, 550, 544 P.3d 748, 765 (2024) ("When an appellant fails to present a cogent argument as to why he should prevail, an award to his opponent is appropriate." (citation omitted)). For these reasons, we conclude that Mother brought this appeal frivolously, unreasonably, or without foundation. Accordingly, Father is entitled to attorney fees under Idaho Code section 12-121.

## IV.  CONCLUSION

We affirm the magistrate court's decision and child custody order in all respects. Attorney fees on appeal are awarded to Father, pursuant to Idaho Code section 12-121. Additionally, as the prevailing party, Father is awarded costs as a matter of course pursuant to Idaho Appellate Rule 40(a).

Chief Justice BEVAN, Justices BRODY, ZAHN, and MEYER CONCUR.